## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| BARBARA HARRISON ,<br>by her next friend and guardian,<br>MARGUERITE HARRISON,<br><br>             Plaintiff,<br><br>v.<br><br>COURTNEY N. PHILLIPS, in her official<br>capacity as THE EXECUTIVE<br>COMMISSIONER, TEXAS HEALTH<br>AND HUMAN SERVICES<br>COMMISSION<br><br>             Defendant. | Cause No. 3:19-CV-1116 |

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

# Table of Contents

**INTRODUCTION** ................................................................................................................ 1

**PARTIES** ............................................................................................................................... 5

**JURISDICTION AND VENUE** ........................................................................................... 6

**BACKGROUND FACTS** ..................................................................................................... 6

    I.    Barbara Harrison and Her Medical Condition. ............................................. 6

    II.    The Texas Medicaid Program ....................................................................... 8

    III.    HHSC's Decision to Terminate Services to Barbara in Her Group Home. ............... 9

    IV.    Federal and State Law Prohibit Unnecessary Institutionalization ........................... 13

    V.    HHSC's Violation of Barbara's Due Process Rights ................................... 16

    VI.    Barbara's Income and Inability to Post Bond ............................................. 19

**COUNT I: VIOLATIONS OF THE ADA AND SECTION 504** ........................................... 19

**COUNT II: VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983** ................................ 20

**PRAYER FOR RELIEF** ...................................................................................................... 21

**VERIFICATION** ................................................................................................................. 25

Barbara Harrison  ("Barbara"), by and through her next friend and guardian Marguerite Harrison, complaining of and against Courtney N. Phillips in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), alleges as follows:

# **INTRODUCTION**

1.      Marguerite Harrison brings this action on behalf of her forty-three year old medically fragile daughter, Barbara Harrison ("Barbara").

2.      HHSC has denied Barbara her due process right under the Medicaid Act to request a Medicaid fair hearing challenging HHSC's decision to deny her general revenue funds, thus terminating her from the Home and Community-Based Services ("HCS") waiver program. HHSC's denial of such funds further violates the Americans with Disabilities Act and other applicable federal law.

3.      HHSC's decision puts Barbara at an extreme risk for a very quick death.

4.      Barbara's medical diagnoses include cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and profound intellectual disability.  Barbara is also non-verbal and non-ambulatory, making it impossible for her to communicate with care givers or family any of her medical needs. Barbara lives at an HCS residential community group home (the "Group Home").

5.      Dr. Terry Hollingsworth, Barbara's primary care physician, has stated unequivocally in correspondence submitted to Defendants and attached to this Complaint as Exhibit A that (1) "Barbara requires [Licensed Vocational Nurse ('LVN')] presence at all times to ensure that she does not aspirate or choke[;]" (2) "[s]uch aspiration and/or choking could potentially lead to death in minutes or could result in pneumonia which could itself be quickly

1

fatal or could further compromise Barbara's respiratory system[;]" and (3) "moving Barbara from her community home where she currently receives LVN services 24/7 to a nursing home without 24/7 LVN services will expose Barbara to respiratory-related illness, will cause a further decline in her health and will carry an extreme risk of resulting in her death."

6.      Plaintiff's other treating physicians, including her Ear, Nose, and Throat Specialist, her gastroenterologist, her urologist, and her pulmonologist, as well as the nurses who provide her daily care, agree with Dr. Hollingsworth's assessment that failing to provide Barbara with the one-on-one 24/7 LVN services she needs and moving her from her community home setting to a nursing home or other institutional setting would carry an extreme risk of resulting in her death.  *See* Exhibits B, C, D, E, and F.

7.      The views of Barbara's treating physicians and nurses were not a new development or surprise to HHSC.  Indeed, the plan of care submitted by Barbara's HCS provider to HHSC unequivocally demonstrates Barbara's need for 24/7 one-on-one nursing care. *See* Exhibit G.

8.      Nevertheless, despite their awareness that the medical professionals working most closely with Barbara deem it medically necessary that she receive 24/7 one-on-one nursing care in the community, HHSC unilaterally determined that it would terminate her services altogether on the basis that the cost of Barbara's care would exceed the cost cap imposed by HHSC on the HCS waiver program.  *See* Exhibit H.  HHSC would thus force Barbara into an institutional setting in which she would quickly die because she cannot receive the necessary 24/7 one-on-one nursing care she requires to survive.  HHSC has taken this step despite the fact that it would actually cost HHSC more for this inadequate institutional care than it would for HHSC to use state general revenue funds to continue Barbara's care in her current environment.  Moreover,

2

HHSC never notified Plaintiff or her HCS care provider that HHSC has state general revenue ("GR") funds available for precisely this purpose—to supplement waiver program funds where necessary to protect the life of a disabled recipient of such funds.   Furthermore, HHSC never gave Barbara the opportunity to appeal her termination from the HCS waiver program based on HHSC's denial of GR funding so that she can continue to remain in her community home and avoid institutionalization.

9.      GR funds are available through a budgetary rider to the General Appropriations Act for the 2018-19 Biennium, Eighty-fifth Texas Legislature, Regular Session 2017 attached as Exhibit I to this Complaint ("Section 23[1]") codified at 40 Tex. Admin. Code § 40.1. When determining whether to approve using GR funds HHSC performs a medical evaluation.  In this case, Senior Associate Medical Director, Dr. Lisa B. Glenn evaluated Barbara's medical condition but did not do so until January 30, 2019, more than two months after her termination from the HCS program. Dr. Glenn recommended institutionalizing Barbara, despite multiple statements from her treating medical professionals that terminating her from the HCS program would inevitably compromise her health and lead to the extreme risk of Barbara's death.

10.     HHSC has denied Barbara  (a) information about accessing GR funds, and (b) her the right to request a fair hearing to contest the denial of GR funding, in violation of Barbara's due process rights under 42 U.S.C. § 1396a(a)(3).

11.     Further HHSC and Dr. Glenn's determination that Barbara would have to leave her community home and move to an institution because her care needs can be met in a state supported living center ("SSLC") or nursing facility violates the Americans with Disabilities Act

---

[1] "Section 23" is used interchangeably with Tex. Admin. Code § 40.1 in this complaint.

("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a).

12.     Indeed, Title II of the ADA prohibits public entities from discriminating against qualified persons with disabilities in providing services.  Similarly, Section 504 prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization.  "[T]he prohibition of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  Consistent with this federal law, Texas state law in the form of the Persons with an Intellectual Disability Act (the "PIDA"), Tex. Health & Safety Code §§ 591.005 and 592.032, expressly contemplates an individual's right to receive needed services in an environment that is "the least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."

13.     HHSC's decision denying Barbara the necessary GR funding she needs to remain in her community home will result in Barbara being forced into an SSLC or other institutional setting that does not provide the LVN 24/7 level of care she requires to keep her from dying quickly.

14.     Because HHSC has deprived Barbara the ability to remain in her HCS community home, Barbara's mother and legally authorized representative ("LAR"), Marguerite Harrison, brings this action on Barbara's behalf, seeking continued funding for Barbara's community home care that is essential to her survival and to obtain declaratory relief for HHSC's denial of Barbara's rights under the Medicaid Act.  Specifically, she complains of (a) HHSC's failure to inform Barbara about the availability of GR funds that were needed to ensure continued life-sustaining nursing, (b)  HHSC's failure to allow Barbara to request a fair hearing for the denial of GR funding, and (c) HHSC's failure to ensure that Barbara continued to receive HCS waiver services in her community home—Barbara's least restrictive environment—in violation of the U.S. Const. amend. XIV, § 1, 42 U.S.C. § 12132 of the ADA, 29 U.S.C. § 794(a) of the Rehabilitation Act of 1973, as well as their respective implementing regulations at 28 C.F.R. §§ 35.130(d) and 41.51(d).

## PARTIES

15.     Plaintiff Barbara Harrison is an adult with numerous disabilities residing in Dallas County.  Marguerite Harrison is the parent and LAR for Plaintiff.  She also resides in Dallas County.

16.     Defendant Courtney N. Phillips is the Executive Commissioner of the Texas Health and Human Services Commission. HHSC is a state agency with principal offices at 4900 North Lamar Blvd., Austin, Texas 78751.  The agency and Executive Commissioner may be served at that location.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States.  Declaratory relief is authorized under 28 U.S.C. § 2201.

18.     Plaintiff's discrimination claims are brought pursuant to 42 U.S.C. § 12133, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983.  Plaintiff's due process claims are brought pursuant to the Fourteenth Amendment to the United States Constitution by means of 42 U.S.C. § 1983.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## BACKGROUND FACTS

### I.     Barbara Harrison and Her Medical Condition.

20.     Barbara, a severely disabled forty-three year old adult, has been medically diagnosed with, among other things, cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and profound intellectual disability. Barbara is also non-verbal and non-ambulatory, making it impossible for her to communicate any of her medical needs.  Barbara is eligible for Medicaid services.

21.     On or about March 2018, Barbara experienced a decline in health. She was transported to the emergency room on three dates in April: April 17, 2018, April 19, 2018, and April 20, 2018.  Thereafter, medical professionals from Berry Family Services, Inc., ("BFS") a provider authorized by HHSC to provide HCS nursing services, determined Barbara required twenty-four hour one-on-one licensed nursing care and that, in light of the complexities and risks

involved, it would pose an imminent risk to Barbara's health to delegate any nursing tasks to an unlicensed professional.

22.     As explained in paragraphs 5 and 6 above, Barbara's treating physicians uniformly concur with the assessments of the medical professionals from Berry Family Services, Inc.  Dr. Terry Hollingsworth, Barbara's primary care physician, has stated unequivocally in correspondence submitted to Defendants and attached to this Complaint as Exhibit A that (1) "Barbara requires LVN presence at all times to ensure that she does not aspirate or choke[;]" (2) "[s]uch aspiration and/or choking could potentially lead to death in minutes or could result in pneumonia which could itself be quickly fatal or could further compromise Barbara's respiratory system[;]" and (3) "moving Barbara from her community home where she currently receives LVN services 24/7 to a nursing home without 24/7 LVN services will expose Barbara to respiratory-related illness, will cause a further decline in her health and will carry an extreme risk of resulting in her death."

23.     Plaintiff's other treating physicians, including her Ear, Nose, and Throat Specialist, her gastroenterologist, and her urologist, as well as the nurses who provide her daily care, agree with Dr. Hollingsworth's assessment that failing to provide Barbara with the one-on-one 24/7 LVN services she needs and moving her from her community home setting to a nursing home or other institutional setting would carry an extreme risk of resulting in her death. *See* Exhibits B, C, D, E, and F.

24.     As further explained in paragraphs 3-6 above, Barbara can only receive the continuous one-on-one monitoring and care by licensed nurses deemed medically necessary by her treating physicians in her group home.  No nursing homes or other long term care institutions provide this level of care. Indeed, institutionalization would be fatal.

7

25.     Since April 2018, Barbara has received continuous one-on-one twenty-four hour care from a LVN.

## II.     The Texas Medicaid Program

26.     The Medicaid program is a joint federal and state funded program enacted to provide necessary medical assistance to aged or disabled persons and families with dependent children whose income and resources are insufficient to meet the cost of care.  42 U.S.C. § 1396. States choosing to participate in the Medicaid program must operate the program in conformity with federal statutory and regulatory requirements.  42 U.S.C. § 1396a.

27.     Each State participating in the Medicaid program must submit a Medicaid plan to the Secretary of the United States Department of Health and Human Services for approval.  42 U.S.C. § 1396.  Each State must also designate a single-state agency to administer and/or supervise the administration of the State's Medicaid plan.  42 U.S.C. § 1396a(a)(5).  HHSC is the Medicaid single-state agency in Texas.

28.     Through a federally approved waiver, states have the option of covering home and community-based services for persons who would otherwise require institutional care that would be paid by Medicaid.  42 U.S.C. § 1396n(c)(1).  Under the waiver authority, the secretary of HHSC may grant waivers of specified requirements such as service limitations that are otherwise applicable to the State's Medicaid plan.  42 U.S.C. § 1396n(c)(3).  Medicaid home and community-based waiver programs enable states to provide the level of services a person would typically receive in an institutional setting in her home or some other community setting. 42 U.S.C. § 1396n(c)(1).

29.     Texas has implemented federally approved home and community-based-care waiver programs in its Medicaid program.  HHSC operates home and community-based

Medicaid waiver programs for persons requiring either a nursing facility level of care or an Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF/IID") level of care.

30.     Among other such programs, HHSC operates a federally approved home and community-based services waiver program for Texans with intellectual or developmental disabilities or related conditions called the HCS waiver.  This waiver provides supports and services to Medicaid recipients with physical or mental disabilities in the home and other community-based placements through a network of HCS provider organizations.  HCS providers, based on the person's individual plan of care ("IPC"), provide and ensure HCS recipients receive all of the supports and services necessary for their health, safety and habilitation in their least restrictive environment. For example, services available through the HCS waiver program include the private duty nursing services Barbara now receives in her group home.  In short, HCS program services are designed to ensure the individual has the opportunity to have all of their individual needs met in the community rather than in a nursing facility or other institutional long term care placement.

## III.   HHSC's Decision to Terminate Services to Barbara in Her Group Home.

31.     HHSC has provided Barbara with Medicaid-funded services in her HCS-funded group home since February 2017. Due to a decline in her health, in April 2018, she required one-on-one 24/7 care by an LVN.  The HCS waiver program has a cost cap. Barbara's IPC exceeds the HCS program cost cap because of her need for the services of an LVN 24/7. However, there are state GR funds available to pay HCS waiver program costs when individual IPC costs exceed the program's 200 percent cost cap. In fact, HHSC has continued to provide Barbara GR funding above the cost cap for over nine months.

9

32.     On or about April 23, 2018, medical professionals from Berry Family Services, Inc., a provider authorized by HHSC to provide HCS nursing services, determined that Barbara required twenty-four hour one-on-one care and that, in light of the complexities and risks involved, a licensed nurse must provide this care.  The conclusions of these professionals were submitted in an IPC to Defendants in April 2018.  The total annual cost for the requested twenty-four hour care was $214,111.29. The annual cost was over the cost limit by $45,496.37.

33.     Upon receiving the April 2018 IPC, HHSC requested additional information.  On May 14, 2018, BFS professionals sent an addendum along with documentation to justify the requested increase in nursing services.

34.     On May 29, 2018, BFS submitted a new updated IPC over the cost ceiling and formally requested GR funds and information regarding next steps on how to seek access to such general revenue funds.

35.      Section 23 (codified at 40 Tex. Admin. Code § 40.1) authorizes HHSC to use such general revenue funds "to pay for services if: (i) the cost of such services exceeds the individual cost limit specified in a medical assistance waiver program . . .; (ii) federal financial participation is not available to pay for such services; and (iii) the commission determines that: (a) the person's health and safety cannot be protected by the services provided within the individual cost limit established for the program; and (b) there is no other available living arrangement in which the person's health and safety can be protected at that time, as evidenced by: i) an assessment conducted by clinical staff of the commission; and ii) supporting documentation, including the person's medical and service records."  *See* Ex. I.

36.     In both oral and written communications with HHSC staff, neither the Plaintiff nor BFS received information on how to access the general revenue funds necessary to keep

Barbara alive.  Instead HHSC unilaterally reduced Barbara's HCS waiver funds below the 24/7 LVN level of care necessary to ensure her survival.

37.     On July 2, 2018, Barbara filed a motion for temporary restraining order and preliminary injunction (*Barbara Harrison by and through her next friend and guardian, Marguerite Harrison v. Cecile Young, The Acting Executive Commissioner, Texas Health and Human Services Commission*, Case 3:18-cv-01730-B) in the United States District Court for the Northern District of Texas, Dallas Division.

38.     On July 16, 2018 the United States District Court for the Northern District of Texas issued a temporary restraining order requiring HHSC to continue funding Barbara's 24/7 one-on-one licensed nursing care pending a hearing on Barbara's preliminary injunction.

39.     On July 31, 2018, while the parties were preparing for the preliminary injunction hearing, HHSC sent Barbara a termination letter informing her that HCS waiver program services would end effective October 29, 2018, because her annual IPC plan year costs beginning November 3, 2017 through November 4, 2018, exceeded the annual cost cap for the HCS waiver program.

40.     At this point, the parties agreed to utilize the administrative fair hearing process rather than move forward on the preliminary injunction hearing. HHSC agreed to continue Barbara's HCS waiver benefits pending the results of an administrative fair hearing. Accordingly, on September 6, 2018, Barbara appealed HHSC's July 31, 2018, decision terminating her from the HCS waiver program. Barbara's administrative fair hearing was subsequently scheduled for November 30, 2018.

41.     On November 20, 2018, 10 days before Barbara's November 30, 2018, fair hearing, HHSC issued another letter terminating Barbara from the HCS program. Similar to

11

HHSC's earlier (July 31, 2018) letter, the agency's letter stated that Barbara's IPC costs for her new plan year beginning November 6, 2018, through November 7, 2019, exceeded the HCS program cost cap.  Because Barbara's pending fair hearing request involved essentially the same issue HHSC outlined in its November 20, 2018, letter, HHSC suggested Barbara withdraw her pending fair hearing appeal request. In return, HHSC agreed to give Barbara until December 15, 2018, to appeal its November 20, 2018, termination letter with HCS services continuing pending the administrative fair hearings officer's decision.

42.     On December 10, 2018, consistent with HHSC's proposal, Barbara appealed HHSC's November 20, 2018, termination letter and a fair hearing was subsequently scheduled for January 23, 2019.

43.     On January 23, 2019, a fair hearing was held regarding Barbara's termination from the HCS waiver program.

44.     On February 4, 2019, while a decision in Barbara's January 23, 2019, administrative appeal was pending, HHSC sent a letter responding to Barbara's request for GR funding to pay those HCS program costs that exceeded the program's cost cap. *See* Exhibit J. The February 4, 2019, letter from Stephanie Muth, HHSC's Medicaid Director, included a January 30, 2019, Memorandum from Dr. Lisa Glenn. The Memorandum from Dr. Glenn stated that based on an evaluation she did on August 3, 2018, Barbara's health and safety needs could be met in an SSLC or nursing facility. Dr. Glenn's report did not address (a) Barbara's need for 24/7 one-on-one licensed nursing care or (b) the basis for concluding that either a SSLC or nursing facility is able to meet Barbara's need for 24/7 one-on-one licensed nursing care. HHSC's February 4, 2019, letter gave Barbara 10 calendar days from receipt of the letter to

submit additional information for HHSC's clinical staff to consider before a final determination is made.

45.     On February 13, 2019, Barbara submitted additional medical documentation supporting her need for 24/7 nursing care.

46.     On March 25, 2019, HHSC affirmed Dr. Glenn's decision denying Barbara GR funding and confirmed that the additional medical documentation submitted by Barbara did not change its assessment.

47.     On May 1, 2019, HHCS's hearings officer issued his decision affirming HHSC's decision entirely because Barbara's plan of care exceeded the applicable cost cap.  The decision did not consider GR funding or any issues of federal law.  *See* Exh. K.

48.     On May 3, 2019, HHSC terminated services for Barbara.  On May 8, 2019, BFS submitted a letter of termination indicating that it could no longer provide services for Barbara given HHSC's termination of funding for such services.  *See* Exh. L.

## IV.    Federal and State Law Prohibit Unnecessary Institutionalization

49.     Even if a nursing home or some other institutional setting could somehow serve Barbara's many medical needs, which is demonstrably not the case, forcing Barbara to seek such services in such an institution instead of in her group home would violate the ADA, Section 504, and the Texas PIDA, Tex. Health & Safety Code §§ 591.005 and 592.032.

50.     Title II of the ADA prohibits public entities from discriminating against qualified persons with disabilities in providing services.  Similarly, Section 504 prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  Policies and practices that have the effect of unjustifiably segregating persons with disabilities in institutions

13

constitute prohibited discrimination under these Acts.  *See, e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600-03 (1999).

51.     Under 28 C.F.R. § 35.130(d), implementing Title II of the ADA, public entities must administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  This same requirement applies to recipients of federal funds under the regulations implementing Section 504 (28 C.F.R. § 41.51(d)).

52.     Regulations implementing Title II of the ADA provide that "a public entity may not directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities … ." 28 C.F.R. § 35.130(b)(3).

53.     HHSC has developed and utilized criteria and methods of administering Texas' long-term care system for persons with developmental disabilities that have the tendency and effect of subjecting the plaintiff to unnecessary and unjustified segregation on the basis of her disability by, among other things, failing to inform her of GR funding that would enable her to continue to reside in a less restrictive, more integrated setting, in violation of 42 U.S.C. § 12132 and 28 U.S.C. § 35.130(b)(3).

54.     The purpose of the Texas PIDA is to preserve and promote the rights of individuals with intellectual disabilities to live at home.  Tex. Health & Safety Code, §§ 591.002(d), 592.013(3).  The PIDA expressly contemplates an individual's right to receive needed services in an environment that is "least confining for a client's condition . . . and

14

provided in the least intrusive manner reasonably and humanely appropriate to the person's needs." *Id.* at §§ 591.005(1) and (2), 592.032.

55.     The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization: "[T]he prohibition of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."

56.     First, Barbara's treating physicians and other medical professionals agree that Barbara both is appropriate for and can benefit from a community setting.  In fact, Barbara's treating physicians and other medical professionals unanimously insist that such a setting is the *only* appropriate setting and, indeed, the only setting in which Barbara can survive. Exs. A–F.

57.     Second, there is no dispute that Barbara wants to be in the community setting. Barbara's mother, Marguerite Harrison, actively supports her care in the community group home.  Furthermore, Barbara's treating physicians and other medical professionals unanimously assert that Barbara's continued care in the group home is necessary to her survival. Exs. A–F.

58.     Third, community-based services can be reasonably accommodated taking into account the resources of the State and the needs of others with comparable disabilities.  HHSC has provided Medicaid services to Barbara in her home for years before her recent need for additional care.  However, notwithstanding Barbara's need for additional care, on information and belief, HHSC cannot not meet her current care needs in an institution at a cost that is less

than her community home placement. Furthermore, if HHSC has cost cap concerns based on Barbara's recent increase in medical need, it can apply to the United States Secretary of Health and Human Services to amend the current cost cap.

59.     As previously stated, state GR funds are available through 40 Tex. Admin. Code § 40.1, a statute designed precisely to provide care in the home to individuals such as Barbara. However, the state currently operates the GR funding program by not allowing for an individual to appeal a denial of GR funding.  In fact, it is not until an individual is terminated from the program that HHSC makes a determination on that individual's request for GR funds at all.  In this case, Barbara was terminated from the HCS waiver program for almost six months before a preliminary determination was made denying her request for GR funding.  *See* Exhibit L.  Had Barbara not been protected through a temporary restraining order previously granted by this Court, that gap in time would inevitably have resulted in significant harm to her health and welfare, almost certainly including her death.  HHSC has made accessing GR funding impossible for persons like Barbara who need an increased level of nursing services to survive.

60.     It would not fundamentally alter HHSC's program, services, or activities to provide Barbara with the necessary GR funds to allow her to continue to live in the community. HHSC can comply with the ADA, Section 504, and the PIDA only by continuing to serve Barbara in her group home.

61.     Consequently, HHSC has impermissibly discriminated against Barbara in violation of the ADA, Section 504, and the PIDA.

## V.      HHSC's Violation of Barbara's Due Process Rights

62.     Pursuant to 42 U.S.C. § 1396a(a)(3), any "State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any

individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." Texas has implemented this requirement with respect to HCS. *See, e.g.*, Tex. Admin. Code §§ 353.2, 353.202, 357.3.

63.    HHSC's November 20, 2018, letter terminating Barbara from the HCS waiver program contains no information about the availability of state GR funds when the individual's care needs exceed the Medicaid cost cap for HCS waiver services. Barbara is entitled to that information as a constitutionally protected property interest.

64.    In terms of Barbara's right to a Medicaid fair hearing, when HHSC denies or reduces Medicaid-funded services to an eligible HCS waiver recipient a Medicaid fair hearing is required under 42 U.S.C. § 1396 and Tex. Admin. Code §§ 353.2, 353.202, and 357.3.

65.    Finally, HHSC's May 1, 2019, decision does not address the general revenue issue, demonstrating HHSC's long-standing policy that, in contravention of federal law, an individual with a disability does not have a right to appeal a denial of general revenue funding. *See* Exhibit K. As a result, Barbara is unable to contest HHSC's decision terminating her from the HCS waiver program based on IPC plan costs exceeding the Medicaid waiver cost cap.

66.    Therefore, HHSC has denied state GR funds under 40 Tex. Admin. Code § 40.1 without providing a right of appeal. HHSC thus violated relevant statutory law. When HHSC denies or reduces Medicaid-funded services to an eligible individual, they must provide a fair hearing. 42 U.S.C. § 1396a(a)(3); Tex. Admin. Code §§ 353.2, 353.202, 357.3. State GR funds that are set aside to supplement HCS program services are inextricably intertwined with the underlying Medicaid funds. Because the determinations made with respect to the various funding sources are inseparable, the Medicaid fair hearing requirements apply to Section 23 state GR funds.

67.     Further reinforcing the inextricability of GR funds from Medicaid determinations, Texas references Section 23 in its HCS waiver application to CMS. The State's application states, among other things, that in the event an HCS waiver recipient's medical condition changes and his or her service needs exceed the relevant cost cap, state GR funds can be used to cover additional waiver costs.  Further, Texas has provided assurances to CMS, without qualification, that "[i]f the State proposes to terminate the individual's waiver eligibility or reduce services, the State give the individual the opportunity to request a fair hearing in accordance with Title 1 of the Texas Administrative Code, Part 15, Chapter 357, Subchapter A."

68.      In short, if the State proposes to terminate an individual's waiver eligibility or reduce services due to exceeding the cost cap, the State must give "the individual the opportunity to request a fair hearing in accordance with Title 1 of the Texas Administrative Code, Part 15, Chapter 357, Subchapter A."

69.     Furthermore, in addition to Barbara's statutory right to a fair hearing, HHSC's failure to provide Barbara a fair hearing also violates the due process provisions of the United States Constitution.  Under the United States Constitution, no state may take any action which would "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. By virtue of her property rights with respect to Medicaid funding and her rights to avoid unnecessary institutionalization and resultant death, Barbara has a due process right to a fair hearing and associated appeal of HHSC's refusal to provide her the level of nursing services she needs to survive.  HHSC impermissibly violated that right.

70.     Finally, HHSC's policy of denying Barbara her right to a fair hearing violates 42 U.S.C. § 1396a(a)(8)'s reasonable promptness provision. Under this provision, Texas is obligated to provide Barbara with the opportunity to request a fair hearing and to provide her

18

with that opportunity with reasonable promptness. Here, the state has not provided an opportunity for Barbara to appeal denial of state general revenue funds, nor have they complied with the reasonable promptness provision of the Medicaid Act. This is especially evident given that the hearings officer failed to make any ruling regarding Barbara's request for state GR funds. *See* Exhibit K.

71.     Moreover, the hearings officer failed even to follow the guidelines promulgated by HHSC itself in its own policy handbook by failing to refer Plaintiff's legal arguments on these issues to the HHSC legal department.  This failure to follow HHSC's own articulated policy further violates due process.

## VI.    Barbara's Income and Inability to Post Bond

72.     Plaintiff's only income is $1,072.00 per month from Medicare disability.  Thus, she is unable to post bond or other security for purposes of seeking the relief requested in this Complaint.

# COUNT I:
# VIOLATIONS OF THE ADA AND SECTION 504

73.     Plaintiff incorporates by reference paragraphs 1-72 as set forth above.

74.     HHSC is a public entity within the meaning of that term under Title II of the ADA.

75.     HHSC is a recipient of federal funds within the meaning of that term under Section 504.

76.     Barbara is a qualified individual with a disability under the ADA, has a "disability" within the meaning of 29 U.S.C. § 705(9), and is otherwise a qualified individual under Section 504.

77.     Barbara's group home constitutes the most integrated, least restrictive, and least confining setting for her.

78.     HHSC's acts constitute unlawful discrimination under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and violate the integration mandate of the regulations implementing these statutory prohibitions against discrimination, 28 C.F.R. §§ 35.130(d) and 41.51(d).

79.     HHSC's acts constitute unlawful discrimination in that it has developed and utilized criteria and methods of administering 40 Tex. Admin. Code § 40.1 in violation of 42 U.S.C. § 12132 and 28 U.S.C. § 35.130(b)(3).

80.     HHSC must interpret and apply 40 Tex. Admin. Code § 40.1 in a manner consistent with these federal statutes.  Its failure to do so constitutes further discrimination for purposes of these statutes.

81.     HHSC's acts will cause Barbara irreparable injury for which there is no adequate remedy at law and will further disserve the public interest.

# COUNT II:
# VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983

82.     Plaintiff incorporates by reference paragraphs 1-81 as set forth above.

83.     Barbara's eligibility for and receipt of Medicaid services creates a property right regarding GR funding which is subject to due process protection under the Fourteenth Amendment to the Constitution of the United States and under Article I, § 19, of the Texas Constitution.

84.     Texas's HCS waiver program specifically provides for a fair hearing as required by 42 C.F.R. Part 431, subpart E, to Medicaid recipients who are denied waiver program services.

85.     HHSC has not provided Barbara the necessary procedural protections and have not provided her with the requisite fair hearing.

86.     By denying Plaintiff the opportunity to access to GR funds and for a fair hearing to challenge the termination of the HCS waiver services necessary to her survival and the denial of the funding that would have allowed such services to continue, whether through the use of GR funds made available through 40 Tex. Admin. Code § 40.1 or otherwise, HHSC has violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, Article I, § 19, of the Texas Constitution, federal Medicaid law and regulations, and the terms of Texas's HCS waiver program.

87.     HHSC is a state actor and liable for the violations of federal constitutional and statutory law pursuant to 42 U.S.C. § 1983.

88.     HHSC's acts will cause Barbara irreparable injury for which there is no adequate remedy at law and will further disserve the public interest.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.      That this Court assume jurisdiction of this cause;

B.      That this Court enter a declaratory judgment that

(a) HHSC's denial of the necessary funding for nursing services for Barbara Harrison in her group home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and their implementing regulations, 28 C.F.R. §§ 35.130(d), and 41.51(d); and

(b) HHSC's failure to offer Plaintiff a fair hearing and an opportunity to appeal HHSC's decision to deny her general revenue funding without such a hearing violates her due process right to an administrative hearing to challenge her

ongoing request for state general revenue funds and her right under the Medicaid Act to request the continuation of HCS program services pending the hearings officer's final decision;

C.     That this Court enter a preliminary and permanent injunction enjoining HHSC from denying funding for the medically necessary nursing services for Barbara Harrison in her group home and from denying Barbara her right under the Medicaid Act to request a fair hearing in order to challenge the state's denial of her request for continued general revenue funding for the life-sustaining nursing services she receives through the HCS waiver program;

D.     That this Court issue a temporary restraining order, directed to HHSC, as well as HHSC's officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, restraining them from denying Barbara her right under the Medicaid Act to request a fair hearing in order to challenge the state's denial of her request for continued GR funding for the life-sustaining nursing services she receives through the HCS waiver program as indicated by her treating physicians, such temporary restraining order to remain in effect until hearing may be held on her application for preliminary injunction;

E.     That this Court set a prompt hearing on Barbara's motion for preliminary injunction restraining HHSC, as well as HHSC's officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, from denying Barbara her right under the Medicaid Act to request a fair hearing in order to challenge the state's denial of her request for continued general revenue funding for the life-sustaining nursing services she

receives through the HCS waiver program until she is provided a fair hearing and any available administrative appeals and, should the result of that hearing and those appeals be adverse, until she has exhausted her judicial remedies;

F.  That this Court, upon final trial of this matter, make the preliminary injunction permanent;

G.  That this Court award Plaintiff her costs and fees, including reasonable attorneys' fees; and

H.  That this Court grant such additional relief as it deems equitable and just.

Dated:  May 8, 2019

Respectfully Submitted,

 /s/ Mark Whitburn

**Attorneys for Plaintiffs**

**Mark Whitburn**
Texas Bar No. 24042144
**Sean Pevsner**
Texas Bar No. 24079130
**Whitburn & Pevsner, PLLC**
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (682) 706-3750
Fax: (682) 706-3789
mwhitburn@whitburnpevsner.com

**Garth Corbett**
Texas Bar No. 04812300
**Sean A. Jackson**
Texas Bar No. 24057550
**Disability Rights Texas**
2222 West Braker Lane
Austin, Texas 78757
Tel: (512) 454-4816
Fax: (512) 323-0902
gcorbett@disabilityrightstx.org

# VERIFICATION

THE STATE OF TEXAS      §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Marguerite Harrison, Guardian of Barbara Harrison, who, in her capacity as Guardian, after being by me duly sworn, upon her oath stated that she has personal knowledge of the facts concerning Barbara Harrison stated in the foregoing Plaintiff's Original Verified Complaint and that each and every statement of fact concerning Barbara Harrison contained in that Original Verified Complaint is true and correct.

*Marguerite Harrison*

Marguerite Harrison, Guardian of Barbara Harrison

SUBSCRIBED AND SWORN TO BEFORE ME on the *8th* day of May, 2019, to certify which witness my hand and official seal.

MARIA G SANCHEZ
NOTARY PUBLIC
ID# 129601117
State of Texas
Comm. Exp. 11-03-2021

*Maria G. Sanchez*

Notary Public in and for the State of Texas