# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| BARBARA HARRISON, by her next friend and guardian, MARGUERITE HARRISON, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:19-CV-1116-B |
| COURTNEY N. PHILLIPS, in her official capacity as THE EXECUTIVE COMMISSIONER, TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | § § § § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Barbara Harrison's motion for a preliminary injunction against Courtney N. Phillips, in her official capacity as the Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). Doc. 3. This is the second time Harrison, a disabled individual, has sued HHSC in this Court for failing to approve sufficient funds to cover her health care in a community setting as opposed to in an institution. *See Harrison v. Young ("Harrison I")*, Case No. 3:18-cv-1730-B. The last case was voluntarily dismissed so that the parties could try to resolve their dispute through the administrative process. They returned to this Court after HHSC again terminated Harrison's 24-hour licensed vocational nursing care.

The parties continue to dispute the proper level of care that Harrison needs, how that care should be funded, and where it should take place. The parties also dispute whether HHSC's process for making these determinations is legal under the ADA and the Constitution. The Court finds that

Harrison has met her burden of showing the four factors required for a preliminary injunction and **GRANTS in PART** and **DENIES in PART** Harrison's motion: the Court orders that HHSC continue funding Harrison's 24-hour licensed nursing care while the parties return to the agency as described below.

## I.

## BACKGROUND

At the core, this dispute is about the process the state uses to allocate funding for medical services for disabled individuals. Plaintiff Barbara Harrison is a forty-three year old woman with severe disabilities. Doc. 1, Compl., ¶¶ 1, 4. She has been medically diagnosed with, among other things, cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and profound intellectual disability. *Id.* ¶ 4; *id.* Exs. A–F. Marguerite Harrison, the mother of Plaintiff, is her next friend and guardian. *Id.* ¶ 1. Defendant Courtney N. Phillips is the Executive Commissioner of the Texas Health and Human Services Commission (HHSC). *Id.* ¶ 16. She is named as Defendant in her official capacity.[1]

Each state participating in the joint federal- and state-funded Medicaid program must submit a plan to the Secretary of the United States Department of Health and Human Services for approval. 42 U.S.C. § 1396. Texas has designated HHSC to administer and supervise the state's Medicaid plan. Tex. Gov't Code § 531.021. Through a federally-approved waiver, states have the option of covering home and community-based services (HCS) for persons with physical or mental disabilities

---

[1] Because this is a suit against an officer in her official capacity for injunctive relief, sovereign immunity is waived under *Ex parte Young*, 209 U.S. 123 (1908). This issue was raised by HHSC, but having reviewed the briefing and authorities, the Court is convinced that suit is proper under *Ex Parte Young* as Harrison requests only injunctive relief.

who would otherwise require institutional care that would be paid for by Medicaid. 42 U.S.C. § 1396n(c)(1). HHSC also operates this waiver program in Texas. Every year HHSC reevaluates whether an individual still qualifies for the waiver program based on the cost of her care. Doc. 9-2, Kenneally Decl., ¶¶ 11–12. And up until April 2018, both parties agreed that Harrison qualified for the HCS program, and she received care through a HCS provider, Berry Family Services.

But in 2018, Harrison alleges that her health worsened. Doc. 14, Pl.'s P.I. Br., 4. Her doctors determined that instead of needing just a few licensed vocation nurse (LVN) hours per year, she would require 24-hour LVN care, or risk aspiration and death. *Id.* at 2–4. LVN services are available through the HCS waiver program, but if HHSC finds that an individual is requesting a level of care above the waiver's cost cap, that person may be removed from the waiver program entirely. *See* 40 Tex. Admin. Code § 9.155 (describing the eligibility criteria of the HCS program). HHSC has discretion to apply additional funds from the state's general revenue funds (Section 23 GR funds), but if it does not, then the individual will no longer be able to receive services at home or in the community, and will likely be institutionalized. *See* 40 Tex. Admin. Code § 40.1; General Appropriations Act, 85th Leg., R.S., art. II-128, § 23(b), Use of General Revenue Funds for Services. HHSC currently offers a fair hearing review process to appeal findings that an individual's plan exceeds the cost cap, but not for a denial of Section 23 GR funds. *See* Doc. 14-15, Ex. O (GR Final Determination), 2.

The waiver program has a $168,615 cost cap for individuals like Harrison. 40 Tex. Admin. Code § 9.155(a)(3)(B). There is no dispute that on April 23, 2018, she requested services that exceed the cost cap as the medical professionals from Berry had determined that Harrison now

needed around-the-clock LVN care for the remainder of the 2018 plan year.[2] Doc. 14, Pl.'s P.I. Br., 4–5. Because providing this type and amount of service costs more than the cost cap allows, Berry asked the Commission to dip into Texas's Section 23 GR funds to make up the difference. *Id.* After reviewing Harrison's Individual Service Plan (ISP) and other documents, HHSC denied her request for 24/7 LVN care, but after some back-and-forth approved her for 8 LVN hours per day for the remainder of the year at a cost below the cap. *Id.* at 4–5; Doc. 9-2, Kenneally Decl., ¶ 15. Because this was a level of care below that which her doctors had determined was medically necessary to keep her alive, on July 2, 2018, Harrison brought suit in this Court for the first time, seeking relief. *See Harrison v. Young ("Harrison I")*, Case No. 3:18-cv-1730.

In that first litigation last summer, Harrison voluntarily dismissed her claims after the Commission agreed to continue fully funding Harrison's health care pending the results of the administrative process. Doc. 3, TRO Mot., 6; No. 3:18-cv-1730, Doc. 32, Notice of Dismissal. The dismissal came after this Court granted a temporary restraining order on July 16, 2018, requiring the Commission to "provide funding for Plaintiff's twenty-four hour one-on-one licensed nursing care" until a preliminary-injunction hearing. *Harrison I*, Case No. 3:18-cv-1730, Doc. 18, Order Granting TRO. The preliminary-injunction hearing never happened, as Harrison dismissed her claims only a few days before, on August 28, 2018.[3]

The parties had agreed to continue Harrison's 24-hour LVN care as they went back to the administrative process. Originally Harrison pursued a fair hearing on HHSC's 2018 decision, which

---

[2] While the plan years run November to November, the Court will refer to each plan by its expiration year, for convenience.

[3] The parties had filed all briefing, and a motion to dismiss had been filed, along with a response. That briefing focused on whether the claim was ripe, as well as the merits of Harrison's claims.

by that point was 12 LVN hours per day for the remainder of the service year. Doc. 9-2, Kenneally Decl., ¶¶ 15–17. But once Harrison's yearly renewal came due, the parties agreed that the fair hearing would address only the 2019 service request, which was also for 24-hour LVN care and also exceeded the cost cap. *Id.* ¶ 17. That fair hearing was conducted on January 23, 2019. Doc. 3, Mot. for TRO, 7. While a decision was pending, HHSC denied her request for general revenue funding. *Id.* at 7–8; Doc. 14-15, Ex. O, 2.

Meanwhile, at the fair hearing in January, Harrison had requested that the hearings officer weigh in on whether general revenue funds were appropriate for Harrison. Doc. 14-13, Ex. M (Transcript), 19. HHSC strenuously objected, saying that the hearings officer did not have jurisdiction to opine on the general revenue funds, only on whether Harrison's requested level of care was over the cost cap—a point neither party disputed. *Id.* at 16–17, 36, 39. In the final opinion, dated May 1, 2019, the hearings officer did not mention whether he considered the availability of general revenue funding to cover the excess cost, or any of the constitutional, federal, or state law issues Harrison raised, and simply concluded that Harrison:

> was no longer eligible to receive services in the Home and Community Services (HCS) program because [Harrison's] proposed 2018-2019 Individual Plan of Care (IPC) exceeded $168,615.00. Therefore, the Agency's action is SUSTAINED.

Doc. 14-11, Ex. K, 6 (reviewing an IPC cost of $327,923.10). HHSC then terminated Harrison's services. On May 8, 2019, Berry sent Harrison its letter indicating it could no longer provide services for Harrison because HHSC would no longer pay for it. Doc. 1, Compl., Ex. L. This suit ensued.

Specifically, Plaintiff requests a declaratory judgment that:

> (a) HHSC's denial of the necessary funding for nursing services for Barabara Harrison in her group home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and their implementing regulations, 28 C.F.R. § 35.130(d) and 41.51(d); and

(b) HHSC's failure to offer Plaintiff a fair hearing and an opportunity to appeal HHSC's decision to deny her general revenue funding without such a hearing violates her due process rights to an administrative hearing to challenge her ongoing request for state general revenue funds and her right under the Medicaid Act to request the continuation of HCS program services pending the hearings officer's final decision

as well as a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining HHSC from denying Harrison funding for medically necessary nursing services in her group home and enjoining HHSC from denying her request for a fair hearing on HHSC's denial of general revenue funds. Doc. 1, Compl, 21–23.

A temporary restraining order hearing was held on May 15, 2019, and the Court ordered that Harrison's 24-hour LVN care be continued until a preliminary-injunction hearing could be held. Doc. 13, TRO. In the interim, the Court requested and was given additional briefing on the issues. At the preliminary-injunction hearing, held June 10, 2019, the Court concluded that Harrison's 24-hour LVN care should be continued, and that it was necessary to order HHSC to conduct additional administrative hearings. The Court solicited proposed orders, which it received, along with objections filed by HHSC. Doc. 33, Pl.'s Proposed Order; Doc. 34, Def.'s Am. Objections. Having reviewed the extensive briefing filed by both sides, the Court memorializes the following findings.

## II.

## LEGAL STANDARD

There are four prerequisites for the extraordinary relief of preliminary injunction. A court may grant such relief only when the movant establishes that:

(1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted. *Mississippi Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if a party fails to meet any of the four requirements, the court cannot grant the preliminary injunction.

## III.

## DISCUSSION

To be entitled to a preliminary injunction, Harrison first must demonstrate a substantial likelihood of success on the merits. She must also demonstrate a substantial likelihood that abstention principles will not preclude relief. *See Sierra Club v. City of San Antonio*, 112 F.3d 789, 793 (5th Cir. 1997) (holding that "whether the [district] court properly entered a preliminarily injunction . . . turns on whether the [plaintiff] established a substantial likelihood of success on the merits in the face of the *Burford* abstention doctrine"); *Lone Star Chapter Paralyzed Veterans of Am. v. City of San Antonio*, 2010 WL 1780353, at *7 (W.D. Tex. May 3, 2010) (citing *Sierra Club* approvingly in the context of a TRO). If abstention is not warranted, the Court need only consider whether Harrison has shown a substantial likelihood of success on the merits of one of her claims. *See Ramada Franchise Sys. Inc. v. Jacobcart, Inc.*, 2001 WL 540213, at *1 (N.D. Tex. May 17, 2001). Thus, the Court first addresses whether abstention under *Burford* is proper before proceeding to address the four preliminary-injunction elements.

A.     Burford *Abstention Does Not Apply Here*

HHSC argues that the Court should abstain from hearing this case, citing *Burford* abstention,

which takes its name from *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). "The general thrust of Burford-type abstention can be well captured by saying that abstention is ordered in order to avoid needless conflict with the administration by a state of its own affairs[.]" § 4244 Needless Conflict with States—When Abstention Required, 17A Fed. Prac. & Proc. Juris. § 4244 (3d ed.). Under *Burford*, abstention is proper "where the issues 'so clearly involve basic problems of [State] policy' that the federal courts should avoid entanglement." *Aransas Project v. Shaw*, 775 F.3d 641, 649 (5th Cir. 2014) (quoting *Burford*, 319 U.S. at 332). Otherwise, "[t]he federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them." *Id.* (internal quotations omitted)

The Supreme Court has explained:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989). In considering *Burford* abstention, the Fifth Circuit weighs the following factors:

> (1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law, or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review.

*Romano v. Greenstein*, 721 F.3d 373, 380 (5th Cir. 2013) (finding *Burford* abstention did not apply in a § 1983 suit challenging a state agency's Medicaid benefits determination) (quoting *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993) (internal quotations omitted)). A court may exercise jurisdiction over a preliminary-injunction matter that ultimately fails to show a

substantial likelihood of success on the merits without running afoul of *Burford. See Jefferson Cmty Health Care Ctrs, Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 622–23 (5th Cir. 2017) (affirming the district court's decision not to abstain under *Burford* although ultimately overturning the preliminary injunction).

Plaintiff relies primarily on two cases to argue that the *Burford* abstention doctrine does not apply: *Romano* and *Jefferson*. Doc. 14, Pl.'s P.I. Br., 21–23. "In *Romano*, a Medicaid beneficiary sued the Louisiana Department of Health and Hospitals under § 1983, alleging that its decisions, policies, and procedures resulted in an illegal termination of her benefits." *Jefferson*, 849 F.3d at 623 (summarizing *Romano*, 721 F.3d at 374–75). The *Romano* court rejected the agency's argument that *Burford* abstention was appropriate, stating that none of the five factors weighed in favor of abstention. *Romano*, 721 F.3d at 380. Likewise, when reviewing another case involving claims based on Medicaid, the Fifth Circuit rejected the defendant's *Burford* argument with the same reasoning as in *Romano. Jefferson*, 849 F.3d at 623. In *Jefferson*, the Fifth Circuit found that the defendant state agency had not overcome the presumption that the federal court should exercise jurisdiction. *See id.* (enumerating the ways the defendant failed to explain how the five factors tilted toward abstention). Notably the *Jefferson* panel distinguished a case decided by the Second Circuit, which also dealt with the provision of home and community-based services for disabled individuals. *Id.* (citing *Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1240 (2d Cir. 1992)).

In *Bethphage*, the Second Circuit affirmed abstention under *Burford* when a nonprofit providing services to persons with mental retardation and other disabilities alleged that the state proposed to fund its service contracts at a level inconsistent with the standards mandated by the Home and Community Based Services Waiver Act. *Bethphage*, 965 F.2d at 1240 (referring to 42

U.S.C. § 1396n(c)). But in that case, the plaintiff was asking the court to set rates and impose terms on the parties' contracts, a function that was normally given to a "complex state administrative process." *Id.* at 1247. The Second Circuit also pointed out that "[i]t is true that *Burford* does not require abstention whenever there exists a complex state administrative process, or even in all cases where there is a potential for conflict with state regulatory law or policy from federal litigation, but only where there would be 'undue' federal interference." *Id.* The Fifth Circuit in *Jefferson* distinguished *Bethphage* in part by the fact that the *Bethphage* district court had found that setting payment rates "'necessarily invokes the expertise and best judgment of the [state's] Commissioner of Mental Retardation and does not lend itself to consistent judicial interpretation.'" *Jefferson*, 849 F.3d at 623 (quoting *Bethphage*, 965 F.2d at 1243). As described below, the Court likewise finds *Bethphage* distinguishable.

Meanwhile, HHSC does not provide any examples in which a court abstained under *Burford* when healthcare involving Medicaid funding was implicated. *See, e.g.,* Doc. 27, Def.'s Br., 8–11. Indeed, in one other almost factually identical case from this district, the court did not abstain, although it does not appear that the *Burford* issue was raised at any point. *See generally, Knowles v. Horn*, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010). HHSC argues generally that federal review of Harrison's case "would disrupt the efforts of the Commission to carry out its obligation[s]" and federal review "could produce a different result than that reached during the administrative process." Doc. 27, Def.'s Br., 10. The fact that state funds are at issue also concerns HHSC. *Id.*

But having considered the aforementioned precedent, and the five factors enumerated by the Fifth Circuit, the Court finds that it should not abstain under *Burford*. First, as to the source of the cause of action, Harrison's claims arise under federal law, a point against abstention. Second, as to

whether the case requires inquiry into unsettled issues of state law, or into local facts, Harrison is asking that state law be applied in a manner consistent with federal law. In addition, the Court will not initially determine what Harrison's medical needs are, nor the cost of these services—the Court initially will defer to HHSC, the agency with the expertise in determining these issues. It is for this reason that the injunctive relief to be ordered at this stage is that HHSC go back and conduct that process first.

Third, as to the importance of the state interest involved, both federal and state funds are at stake, but they are very much intertwined. As the program is currently administered, HHSC first considers whether a plaintiff's service request is above the federal waiver limit, then HHSC considers whether state general revenue funds are appropriate. While HHSC separates these two steps, the same organization, and the same services are involved. And ultimately, the same rights are implicated—whether an individual receives general revenue and federal funds determines whether she is institutionalized or provided community-based care. This supports a finding that state general revenue funds that are set aside to supplement the home and community-based waiver program services are "inextricably intertwined" with the underlying Medicaid funds, as the court in *Knowles* stated, 2010 WL 517591, at *6, and diminishes the relative importance of the state's interest.

Fourth, while the Court acknowledges that the state has an interest in a coherent policy in administrating the HCS waiver program and general revenue funds, that interest may not override the need for that process to comply with the Constitution and federal law. While Harrison brings her claim as an individual, if this same process is what is provided to other individuals—a logical conclusion, given HHSC's arguments—it may be that there is a system-wide failure of HHSC's process in assessing whether individuals should be treated in the community or in an institution. *See*

*Bethphage*, 965 F.2d at 1247 (distinguishing between a challenge that implicates only an individualized issue as compared to a systemic issue when deciding if *Burford* abstention is appropriate). Fifth, while there is a state forum for judicial review of decisions by a fair hearings officer, HHSC firmly states that there is no review available for a denial of general revenue funding. Doc. 14-15, Ex. O, 2. Finally, federal courts regularly exercise jurisdiction over questions involving due process and institutionalization of disabled individuals. *See generally, Knowles*, 2010 WL 517591; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). Thus the Court does not abstain under *Burford*.

B.      *Substantial Likelihood of Success on the Merits*

Harrison brings two claims: (1) a violation of the ADA and Section 504; and (2) a violation of due process and 42 U.S.C. § 1983. Doc. 1, Compl., 19-21. The Court finds that she has shown a substantial likelihood of success on the merits of both claims.

1.      Claim 1: Violation of Title II of the ADA and Section 504

To state a Title II ADA claim, a plaintiff must allege that (1) she has a qualifying disability; (2) she is being denied benefits of services, programs, or activities for which the public entity is responsible or is otherwise discriminated against by the public entity; and (3) such discrimination is by reason of her disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). This arises under 42 U.S.C. § 12132, which prohibits discrimination against qualified disabled individuals:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

"[T]he rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely

duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The "only material difference" is the causation requirement—under § 504, the plaintiff's disability must be the sole cause of the discriminatory action, not merely a "motivating factor." *Id.*; *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002). Courts construe and apply these statutes in a consistent manner. *Knowles v. Horn*, 2010 WL 517591, at *3 (N.D. Tex. Feb. 10, 2010). Here the Court looks through the lense of the ADA.

The Supreme Court has clarified that policies and practices that have the effect of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 588, 600–03 (1999) (considering only whether a statutory violation occurred, and not reaching the due-process constitutional issue). A state's refusal to provide services for qualified disabled individuals in a home-based or community setting—as opposed to an institution—has been held to violate the ADA's prohibition against unjustified segregation. *Knowles*, 2010 WL 517591 at *5. In *Olmstead*, the Supreme Court concluded that the ADA encompassed an integration mandate that prohibited unnecessary institutionalization, and outlined three elements to be considered in such a claim:

> the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions. . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 587. In other words, an agency is expected to make reasonable modifications to its programs to achieve this integration mandate. *Id.* at 592. But an agency may defend its position by showing that the requested modifications would constitute a "fundamental alteration" of the State's services

and programs. *Id.* at 597. At the motion-to-dismiss stage, it is often not appropriate to decide whether the injunctive relief that a plaintiff requests would require a fundamental alteration of the State's programs and services. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004) (overturning and remanding for further proceedings the district court's grant of judgment on the pleadings in favor of the state agency because the pleadings did not permit a finding that the relief sought was unreasonable or a fundamental alteration of the state's programs). That defense should be considered in light of "the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably." *Olmstead*, 527 U.S. at 597. A "simple comparison" between "the cost of caring for the plaintiff[] in a community-based setting with the cost of caring for [her] in an institution" may be too simplistic. *Id.* at 604.

Here, HHSC and Harrison disagree as to whether several parts of *Olmstead* are met. For the first element—the opinion of the treating physicians—Harrison first points out that it is not correct that the state's professionals should receive deference. Doc. 14, Pl.'s Br., 14 & n.5–6. Although *Olmstead* references "state treatment professionals," courts look to the opinions of a plaintiff's treatment professionals in general, whether or not they are employed by the state. *See, e.g., Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) (citing cases). Harrison's treating doctors agree that Plaintiff should be provided 24-hour care in a community setting. They have held this position with near-perfect consistency: while at the TRO hearing Plaintiff relied on doctors' affidavits from 2018, Plaintiff has since provided updated affidavits from May 2019 that either support Plaintiff's treatment in a community setting, or agree that she requires 24-hour LVN care. Docs. 14-1–14-6, Exs. A–F. Meanwhile, although HHSC has consistently argued that full-time LVN care is

unnecessary, it has provided conflicting reports of what her care should entail: it could be no more than 8, 10, or 12 hours of LVN care per day, and/or full-time care provided by an attendant, not a nurse. Doc. 9-2, Kenneally Decl. ¶¶ 15–16; Doc. 21, Def.'s MTD App. (Glenn Decl.), ¶ 19; Doc. 27, Def.'s Br., 14 (citing the declarations of HHSC's medical professionals). At this stage, the Court affords more weight to the opinions of Harrison's doctors, and finds that she has met her burden on this element.

As for the second element, the wishes of the individual, everyone agrees that Harrison herself wants to be in a community setting.[4] Where the parties seem to really disagree is the third element—whether Harrison's placement in the community can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities. Harrison argues that her placement in community care can be reasonably accommodated, and that at a minimum, the State has not shown that providing care in an institutional setting would cost less than providing care in the community. Doc. 14, Pl.'s Br., 13–19. Because HHSC did not identify an institution that could care for her before litigation began, she provides cost estimates—based on HHSC's own data—for what her care would be in an institution, even without additional daily costs for 24/7 one-on-one nursing, and shows that it would exceed the amount Berry proposed for her care

---

[4] Shortly before the preliminary-injunction hearing, an HHSC professional conducted another home visit to Harrison and noted the ways in which Berry might not be the most stimulating environment for Harrison, as compared to what she could experience at an institution. *See* Doc. 27-1, Galbraith Decl., 4–6, 8 (noting the lack of services available at Berry to help Harrison integrate into the community, and highlighting the availability of those types of services at Denton). And at the hearing, HHSC argued that Harrison wasn't being integrated into the community at all at Berry. But if anything, these observations—made only after litigation began—only confirms that HHSC's limited review process and conclusions are lacking and should be given less weight than the individuals and professionals that have on-going relationships with Harrison. It does not convince the Court that Harrison herself would prefer an institution.

in the community. *Id.* at 15–16, 15 n.8 (reporting a cost of $333,204.85 for institutionalization as compared to $327,923.10 for community-based care). Especially in light of the fact that HHSC has not presented its own cost comparison, nor had it identified the institution that would serve Harrison before this litigation began, the Court finds that Harrison has met her burden on the third element show at this initial stage.

As for HHSC's possible defense that providing services to Harrison in the community would cause a "fundamental alteration" of HHSC's program, the Court has insufficient information to evaluate its merits. As discussed in more detail below, HHSC's current administrative process did not address several of the factors that would be relevant in deciding this point, such as Harrison's actual medical needs, the cost of community-based care, and the cost of institutionalization. In short, the Court finds that Harrison has met her burden to show a substantial likelihood of success on her first claim: that institutional isolation of Harrison on the basis of the current administrative record would be unjustified in violation of *Olmstead* and the ADA.

2.     Claim 2: Due Process Violation

Harrison also brings a due process claim. For the following reasons, the Court finds that she has shown a substantial likelihood of success on the merits of this claim as well.

Title 42 U.S. § 1983 protects individuals from constitutional violations. Under the United States Constitution, no state may take any action which would "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "Application for Medicaid benefits, even before eligibility has been determined, qualifies as a constitutionally protected property interest." *Knowles*, 2010 WL 517591, at *6 (citing *Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004)). In *Knowles*, the court found that a due process violation occurred when the disabled plaintiff

seeking to avoid institutionialization was not afforded a fair hearing and appeal before HHSC sought to terminate his home-based services. *Id.* Recognizing that general revenue funds—while from state, and not federal coffers—were "inextricably intertwined" with the underlying Medicaid funds, the court found a due process violation had occurred because HHSC had failed to provide a fair hearing as to whether general revenue funds should be allocated for his care. *Id.*

Very similar facts are at play here—like in *Knowles*, HHSC did not provide a fair hearing to Harrison on its denial of general revenue funds. Instead, the process was as follows: first, HHSC reviewed whether Harrison's requested services exceeded the cost cap, which everyone was in agreement that they did. Doc. 14-9, Ex. I, 3 (proposed termination). There was no review of what level of services she actually required. She appealed HHSC's decision that denied her funding request for the 24-hour care to a fair hearings officer. That hearings officer declined to address whether general revenue funds could cover her care; it appears the hearings officer was concerned with acting without jurisdiction.[5] *See, e.g.,* Doc. 14-13, Ex. M, 16–17 (transcript of hearing, HHSC stating that because general revenue funds are not public assistance benefits as described by Tex. Gov. Code Section 531.019, they are not subject to fair hearings).

HHSC separately considered her for general revenue funds. Dr. Lisa Glenn was assigned to that task, which included an in-person visit with Harrison and a desk review of medical records. Doc. 9-3, Glenn Decl., ¶ 6. On that basis, Harrison's request for general revenue funds was denied. Doc. 14-14, Ex. N (Jan. 30, 2019 letter summarizing the findings of HHSC's general revenue review). Other than being given ten days to supplement her record, there was no fair hearing review. *See id.*

---

[5] The Court addresses these concerns in Section IV, Relief Requested.

In addition, nowhere in that determination, nor in any other, does it appear that HHSC considered whether Harrison's needs could be met in a community setting in a manner that conformed to *Olmstead's* integration mandate. Doc. 9-3, Glenn Decl., ¶ 10 (describing how HHSC's Dr. Glenn, the doctor in charge of general-revenue review, found simply that Harrison's needs could be met in an institutional setting). Section 23(b) of the 2018-2019 General Appropriations Act, which describes the use of general revenue funds for services above the cost cap, states that, in general, "the commission is authorized to use General Revenue Funds to pay for services if:"

> (i) the cost of such services exceeds the individual cost limit specified in a medical assistance waiver program listed above;
>
> (ii) federal financial participation is not available to pay for such services; and
>
> (iii) the commission determines that:
>
>> (a) the person's health and safety cannot be protected by the services provided within the individual cost limit established for the program; and
>>
>> (b) there is no other available living arrangement in which the person's health and safety can be protected at that time, as evidenced by:
>>
>>> (i) an assessment conducted by clinical staff of the commission; and
>>>
>>> (ii) supporting documentation, including the person's medical and service records

Doc. 14-10, Ex. J, 3 (text of Section 23(b)(1) reproduced). The Court is of the opinion that this guidance to HHSC should be interpreted to comply with *Olmstead's* integration mandate; indeed, the State already contemplates that general revenue funds should be available for a subset of individuals when "continuation of those services is *necessary for the person to live in the most integrated setting appropriate* to the needs of the person." *Id.* at 4 (text of Section 23(b)(2) reproduced) (emphasis added). While this language is not dispositive to the Court's analysis, it does suggest to this

Court that HHSC is in fact capable of performing the very *Olmstead* analysis Harrison requests.

Thus, the Court finds that Harrison has shown a substantial likelihood of success on the merits of her due process claim that a fair hearing was necessary to review the denial of Section 23 general revenue funds. And for the reasons discussed above, she has also carried her burden to show that such a fair hearing would also need to be conducted with *Olmstead*'s integration mandate in mind.

C.     *Substantial Threat of Immediate and Irreparable Harm*

As discussed below, the Court also finds that Harrison has met her burden on the second element by demonstrating a substantial risk of immediate and irreparable harm. Harrison's doctors unanimously state that Harrison is at risk of death without 24-hour LVN care, and it goes without saying that Harrison's death would be irreparable. But there is a dispute about whether she needs around-the-clock care now, something she hasn't always needed.

An overview of the dispute is relevant. In November 2017, HHSC approved a Berry-requested plan of 48 hours of LVN care per year for the period of November 2017 to November 2018. Doc. 9-2, Kennelly Decl., ¶ 15. In April 2018, Berry submitted a revised request for round-the-clock LVN care. *Id.* As that exceeded the cost cap, HHSC reviewed the request and ultimately increased Harrison's LVN services to 1,176 LVN-hours per year. *Id.* Berry then submitted two subsequent revisions in May 2018, first requesting 1,271 LVN hours (accommodated by reducing other services), and another eight days later for 5,300 hours. *Id.* HHSC found that the justification provided by Berry for this increase was inadequate, and on June 15, 2018, one of its registered nurses approved 2,795 LVN hours, which calculated out to 8 hours per day of LVN services at a total waiver cost of $149,907.13. *Id.* That's when Harrison filed her first motion for a temporary

restraining order, which this Court granted for the 24-hour care. *Id.* ¶ 16.

One week later, Berry submitted another revised request for 24-hour care. *Id.* HHSC then sent a doctor and two nurses to assess Harrison's needs in-person. *Id.* The doctor, Dr. Lisa Glenn, concluded that Harrison's needs could be met in an institutional setting. Doc. 9-3, Glenn Decl., ¶ 10 (declaration signed May 10, 2019). Dr. Glenn reached this conclusion after her one hour and thirty six minute in-person visit to Berry on August 3, 2018, as well as her review of Harrison's medical records. *Id.* ¶¶ 7–10. The two nurses also performed an in-person assessment, and one nurse concluded that Harrison would benefit from 10–12 hours of services per day. Doc. 9-2, Kenneally Decl., ¶ 16. Based on her assessment, HHSC approved Harrison for 12 hours a day for the remainder of the service year, *i.e.*, through November 6, 2018. *Id.* On August 31, 2018, Harrison requested a fair hearing review of this approval, which was scheduled but then postponed. *Id.* ¶¶ 16–17.

Meanwhile, Harrison's yearly renewal came due. *Id.* ¶ 17. Berry again requested 24-hour care, for the 2019 period. *Id.* A different nurse reviewed the request, and determined that Harrison needed no more than 10 hours of LVN care per day. *Id.* Since this was still over the cost cap, HHSC sent Harrison a proposed termination letter. *Id.* Harrison then withdrew her fair hearing request on the 2018 plan and requested a fair hearing on the 2019 plan on December 11, 2018. *Id.* At the fair hearing, held January 23, 2019, the fair hearings officer decided only the limited question of whether Harrison's request for 24-hour care would exceed the waiver program's cost cap, which both sides agreed it did. *Id.* Also in January, Dr. Glenn performed a desk review of Harrison's records to determine whether GR funds were appropriate, and again concluded that Harrison's needs "had not changed substantially" since her previous GR assessment in August 2018, and that an institution could accommodate her. Doc. 9-3, Glenn Decl., ¶¶ 11–13. None of her reviews convinced her that

Harrison "needs nursing care at the 24 hour a day, 7 day a week level or that there has been a recent and lasting decline in her health status." *Id.* ¶ 18. Another doctor—the medical director of the Denton State Supported Living Center—visited Harrison on June 3, 2019, and after a desk review concluded that his institution could support Harrison's needs. Doc. 27-1, Galbraith Decl., 3–4, 7.[6] Without opining on the appropriate level of care, he described how 24-hour LVN care is provided at his institution without the presence of a nurse in a patient's room 24 hours a day. *Id.* at 7. He also called several of Harrison's doctors, who recommended 24-hour LVN care. *Id.* at 6. He reports that those he reached expressed no objection to Harrison being relocated as long as "appropriate" care was provided. *Id.*

As the above facts show, Berry and Harrison have with near-perfect consistency requested what amounts to 24-hour care for Harrison since April 2018, while HHSC has wavered between recommending 8 to 12 hours, and even describes how 24-hour LVN care might be provided. No fair hearings officer decided what the appropriate level of care for Harrison was, so this Court is left to weigh the conflicting evidence from each side.

In a similar case in this district, at the preliminary-injunction stage the court weighed contradictory medical opinions when considering the irreparable injury factor. *See Knowles*, 2010 WL 517591, at *7 (finding the opinion of the patient's doctors more credible). In *Knowles*, the court discounted the state's opinion that the plaintiff should be cared for in an institution in part because of boilerplate language and the use of the wrong names of the patient and institution. *Id.* In that case, the level of care was undisputed—the plaintiff required continuous care to avoid death from

_____

[6] HHSC submitted an amended declaration on June 7, 2019, but there is no apparent difference between the two.

aspiration, but the parties disputed whether that care could be provided in a Denton institution. *See id.* at *1, 4 (defining the facts in the light most favorable to the state as the summary-judgment non-movant). Here, Harrison's team is the one that provides very similsar declarations, and the facts are disputed. Doc. 1-1, Exs. A–D (declarations from Harrison's doctors); Exs. E–F (declarations from Harrison's nurses). But even though in *Knowles* it was more apparent that the state's doctor's opinion was cursory and worthy of less weight, the Court finds that the opinion of Harrison's own doctors should carry more weight at the preliminary-injunction stage than that of HHSC's professionals because HHSC's professionals have not been consistent in identifying how much care Harrison actually needs and there is likelihood of irreparable injury if Harrison's services are terminated.

In addition, courts have held that the risk of institutionalization itself contributes to a showing of likelihood of irreparable injury. *See e.g., M.R. v. Dreyfus*, 697 F.3d 706, 729, 733 (9th Cir. 2012); *see also* Doc. 14, Pl.'s Br., 23–24 (citing cases). Berry has already stated, on May 8, 2019, that given her termination from the HCS program on May 1, it was unable to provide her with home-based services without funding for 24-hour care. Doc. 1-1, Pl.'s App., 54 (Ex. L, Berry Termination Letter). HHSC has indicated that it believes institutionalization is the proper route. Doc. 9-3, Glenn Decl., ¶ 18; Doc. 27-1, Galbraith Decl., 7–8. Given the opinions of Harrison's medical professionals, and the risk of institutionalization, the Court finds that Harrison has met her burden at this stage on this issue.

D.    *Balance of Harms and the Public Interest*

The third and fourth factors—harm to the defendant and service of the public interest—are related here, as the defendant is a state agency charged with protecting the public interest. *Knowles*, 2010 WL 517591, at *8. In *Knowles*, the court considered the cost difference between in-home care

and institutionalized care—defendants in that case asserted "that the cost difference between in-home care and institutional care for Plaintiff equates to twenty-three other patients who would be prevented from participating in waiver services." *Id.* at *7. The court in that case decided that the balance of harms "tilt[ed] decidedly toward" the plaintiff because there was "no indication . . . that these hypothetical patients face[d] a likelihood of death." *Id.* The court also noted that "[t]he public interest cannot be measured solely in financial increments and must account for the dignity of life and the preservation of families." *Id.* at *8.

Here, HHSC has not provided a cost comparison of continuing services in an institution versus in a community setting. Shortly before the preliminary-injunction hearing, HHSC provided a declaration from Dr. Galbraith, in which he stated that Harrison could be treated at the Denton State Supported Living Center, where he is the medical director. Doc. 27-1, Galbraith Decl., 7. He appears to indicate that the 24-hour care requested could be provided there, without a nurse present around-the-clock. *Id.* at 7–8. But he did not include a cost estimate. Using information from HHSC's website, Harrison calculates the annual rate of care in an institution would be $333,204.85, which is several thousand dollars more than the cost of her proposal for care at Berry ($327,923.10). Doc. 14, Pl.'s Resp., 15–16. Thus at this point it does not appear that there would be an appreciable difference in the cost to the public for her in-home care as opposed to in an institution, as HHSC favors.

In addition, Harrison's concerns, if ultimately valid, would suggest that HHSC's process for evaluating the needs of other disabled individuals does not conform to federal law. And a state health agency "can never have a legitimate interest in administering [its Medicaid program] in a manner that violates federal law." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir.

2017) (upholding a preliminary injunction). Even though some of the funding for Harrison's care might implicate the state's general revenue fund, that funding is "inextricably intertwined with the underlying Medicaid funds." *Knowles*, 2010 WL 517591, at *6. And even a "budget crisis does not excuse ongoing violations of federal law." *Gee*, 862 F.3d at 471 (quoting *Indep. Living Center of S. Ca., Inc. v. Maxwell–Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *vacated and remanded on other grounds*, 565 U.S. 606 (2012)). "State budgetary considerations do not therefore, in social welfare cases, constitute a critical public interest that would be injured by the grant of preliminary relief." *Id.* (quoting *Indep. Living Center*, 572 F.3d at 659); *see also Blue Bell Creameries, L.P. v. Denali Co., LLC*, 2008 WL 2965655, at *7 (S.D. Tex. July 31, 2008) (citing cases) (noting, in the preliminary-injunction context, that "the public interest is served whenever state and federal laws are enforced").

For these reasons, the Court finds that Harrison has met her burden on the third and fourth factor. Given the above, and the arguments made at the preliminary-injunction hearing, this Court is convinced that a preliminary injunction is warranted.

## IV.

## RELIEF REQUESTED

Having found that all four preliminary-injunction factors have been met, the Court turns to some concerns that HHSC has expressed about the requested relief. At the preliminary-injunction hearing, the Court found that to properly address Plaintiff's concerns about the administrative process, HHSC must provide Plaintiff a fair hearing or hearings on issues not yet addressed by the hearings officer. The Court requested that both sides confer and file a proposal as to the scope of the additional hearings. After Harrison proposed details for a bifurcated process, HHSC responded with several objections, which the Court now addresses.

Harrison proposes that the first fair hearing should establish her medical needs, including the number of LVN hours that she requires. Doc. 33, Proposed Order, 2–3. HHSC objects that it is not necessary to determine Harrison's attendant-care needs and "other components to her care that could contribute to the cost of such care in either a community-based . . . or institutional setting," given how HHSC calculates costs. Doc. 34, Def.'s Resp., 6–7. This may be the case, and the Court will craft its order accordingly. But HHSC does not raise an objection that the fair hearings officer would be acting outside her authority to make findings as to Harrison's medical needs, thus the Court will order this relief. *See id.*

Instead, HHSC mainly challenges Harrison's proposal for the second hearing. In the second hearing, Harrison would have the fair hearings officer determine: (1) the cost of continued care for Plaintiff in the community; (2) the cost of institutional placement; and (3) whether HHSC's continued provision of care for her in the community under the HCS waiver program would be unreasonably burdensome to HHSC. Doc. 33, Pl.'s Proposed Order, 3. HHSC strenuously objects to a fair hearing on Harrison's third request.

First, HHSC argues that the third element would require the fair hearings officer to "undertake a complicated legal analysis" under *Olmstead* based upon an affirmative defense—"fundamental alteration"—that HHSC has not raised. Doc. 34, Def.'s Resp., 1. HHSC argues that it is too early in the process of these proceedings to resolve this issue. *Id.* at 2. The Court agrees in that the Court will not make such a finding now, which is why it will order the agency to first conduct its analysis in light of *Olmstead*, followed by review by the fair hearings officer. As discussed in more detail below, the Court is not convinced that to ask HHSC to consider the constitutionality of its actions is in any way improper.

The rest of HHSC's argument is that a fair hearings officer is typically not an attorney, and does not have the authority to determine if a policy is contrary to law or unconstitutional. *Id.* at 3–4. HHSC cites § 1513 of HHSC's Fair and Fraud Hearings Handbook. In full that section states:

> A hearings officer does not have the authority to determine if policy is contrary to law or unconstitutional. When an appellant or his legal representative alleges a policy is contrary to law or unconstitutional, the hearings officer should state that the hearing decision will be based on program policy in effect at the time of the agency action. If a challenge is made that an action was contrary to law, or the basis for the action is unconstitutional, the hearings officer will seek a legal opinion as outlined in Section 1569, Obtaining a Legal Clarification.

Fair and Fraud Hearings Handbook, § 1513 "Limitation of Authority of Hearings Officers" https://hhs.texas.gov/laws-regulations/handbooks/ffhh/section-1000-fair-hearings. According to the last sentence in that section, "[i]f a challenge is made that an action was contrary to law, or the basis for the action is unconstitutional, the hearings officer *will* seek a legal opinion as outlined in Section 1569, Obtaining a Legal Clarification." *Id.* (emphasis added). Section 1569 describes how a legal clarification request is made, and, among other things, that the "response must be shared with all parties and each side must have an opportunity to provide comment or rebuttal of the opinion." *Id.* § 1569. Thus, the Court is not convinced that the fair hearings process could not address whether HHSC's action to remove Harrison from her group home and place her in an institution is contrary to law or unconstitutional.

HHSC also points to its rules that state that "the agency is not required to grant a hearing if the sole issue is a federal or state law requiring an automatic change adversely affecting some or all clients." 1 Tex. Admin. Code § 357.3(b)(4)(b). Again, this does not appear to actually prohibit review in this circumstance: a plain reading of the statute would support the conclusion that an agency *may* grant a hearing. *See id.* Nor is it clear that the hearings the Court now orders would be

covered by this statute, as a federal question is not the sole issue—*e.g.*, the officer is to also address the number of nursing hours required and the cost of the programs—and the Court has been unable to locate any authority that would support the argument that the relief directed here encompasses an "automatic change," as required for that statute to take effect. *See id.*

The Court also pauses to address other elements in Harrison's proposed preliminary injunction. Harrison also requests, that for the second hearing, the fair hearings officer be bound by the following presumptions:

> If the cost of continued care for Plaintiff in the community does not exceed the cost of an institutional placement for Plaintiff, it will be presumed that the continued provision of care for Plaintiff in the community would not be unreasonably burdensome to HHSC.

Doc. 33, Pl.'s Proposed Order. The Court is not convinced that this presumption is warranted, and recognizes that there may be other factors to be considered, to which HHSC is more knowledgeable at this stage of the proceedings than this Court. In *Radaszewski*, for example, the Seventh Circuit clarified that a more developed record than one typically available at the pleadings stage is necessary to determine whether placement of an individual in a institution violates *Olmstead*, and whether caring for that individual in a home or community-based setting would require a "fundamental alteration" of the State's programs and services. 383 F.3d at 614. Ultimately, "[a] court must . . . take care to consider the cost of a plaintiff's care not in isolation, but in the context of the care it must provide to all individuals with disabilities comparable to those of the plaintiff." While it is true that the Seventh Circuit opined that equal costs would probably not support a "fundamental alteration defense," the court recognized that a one-to-one cost comparison might not capture the peripheral costs that might be incurred "by funding a community placement for the individual who can be cared

for [in a community setting] while continuing to provide institutional services for those who cannot be cared for in a community setting."[7] *Id.* (citing *Olmstead*, 527 U.S. at 604). Thus, the Court will not include this presumption.

## V.

## CONCLUSION

Given the above, and the arguments made at the preliminary-injunction hearing, this Court is convinced that a preliminary injunction is warranted. Plaintiff Barbara Harrison's Motion for a Preliminary Injunction (Doc. 3) is hereby **GRANTED in PART** and **DENIED in PART** as follows. The Court **ORDERS** two specific types of relief.

First, Plaintiff Barbara Harrison's care must be assured while the administrative process continues. Defendant and Defendant's agents are therefore enjoined from refusing to reinstate and provide funding for Harrison's twenty-four hour seven days per week one-on-one licensed nursing care under the HCS waiver program until the requisite administrative fair hearings are held and decisions issued as specified further below.

Second, the Court finds that to properly address Harrison's concerns about the administrative process, HHSC must provide Harrison a fair hearing or hearings on issues not yet addressed by the hearings officer. First, HHSC shall work with Harrison to ascertain the level of care appropriate for

---

[7] Specifically, the Seventh Circuit said:

> If the State would have to pay a private facility to care for [Harrison], for example, and the cost of that placement equaled or exceeded the cost of caring for h[er] at home, then it would be difficult to see how requiring the State to pay for at-home care would amount to an unreasonable, fundamental alteration of its programs and services.

*Radaszewski,* 383 F.3d at 614.

her, which includes the precise number of LVN nursing hours she medically requires. This determination should be reviewed and, if necessary, any remaining disputes about the level of care and appropriate number of LVN hours should be decided at a fair hearing.

In the event the fair hearing decision finds that Harrison requires an amount of services that HHSC determines exceeds the HCS cost limitations and Harrison requests supplemental funding —including general revenue funding—HHSC must compare the costs of caring for Harrison in the community as compared to in an institution, and consider as part of its analysis whether providing the additional funds would be unreasonably burdensome to HHSC, in violation of *Olmstead*, which states that:

> States are required to provide community-based treatment for persons with mental disabilities when the . . . treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the treatment can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

527 U.S. at 607. If after this review, HHSC declines to provide additional discretionary general revenue or other supplemental funding to support Harrison's continued care in the community, and HHSC indicates its intent to terminate Harrison from the HCS waiver program, Harrison may then request a second administrative fair hearing. At a second hearing, HHSC must allow the cost of Harrison's care in the community and the cost of Harrison's care in an institution to be compared. The fair hearings officer must review the costs of care in each scenario, determine whether the costs are accurate, and determine whether HHSC's continued provision of care for Harrison in the community under the HCS waiver program would be unreasonably burdensome to HHSC.

In their analyses of whether the care would be unreasonably burdensome, HHSC and the fair hearings officer may consider not only the cost of providing community-based care to Harrison, but

also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably. *See Olmstead*, 527 U.S. at 597. However, if it would cost the State no more and possibly less to care for Harrison in the community than it would to care for her in an institution, this would be highly relevant to whether the State is obliged to provide her with community-based care. *See Radaszewski*, 383 F.3d at 614.

If the fair hearings officer finds that the continued provision of care for Plaintiff in the community would not be unreasonably burdensome to HHSC, Defendant and Defendant's agents are enjoined from terminating Harrison's continued care under the HCS waiver program at a level no lower than that determined necessary by the fair hearings officer, unless and until such decision is overturned through administrative appeal or a judicial mechanism.

Both Harrison and Defendant must have the opportunity to seek administrative review of all fair hearings officer decisions through the appellate mechanisms currently provided by HHSC for review of fair hearings officer decisions.

SO ORDERED.

SIGNED July 3, 2019.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE