UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BARBARA HARRISON by her next friend and guardian, MARGUERITE HARRISON, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:19-CV-1116-B |
| CECILE ERWIN YOUNG in her official capacity as the Executive Commissioner, Texas Health and Human Services Commission, | § § § § § | |
| Defendant. | § § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Barbara Harrison's Motion for Summary Judgment (Doc. 60);

Defendant Cecile Erwin Young, in her official capacity as the Executive Commissioner of the Texas

Health and Human Services Commission ("HHSC")'s, Motion for Summary Judgment (Doc. 65);

and the United States of America's Statement of Interest (Doc. 79). For the following reasons, the

Court concludes Harrison's ADA claim should be **DISMISSED AS MOOT** and HHSC's Motion

regarding Harrison's due process claim should be **GRANTED**. Thus, the Court **DENIES**

Harrison's Motion and **GRANTS in part** and **DENIES in part** HHSC's Motion.

## I.

## BACKGROUND

This dispute concerns the process the State of Texas uses to allocate funding for medical

services for disabled individuals. Plaintiff Barbara Harrison is a forty-seven-year-old woman with

severe disabilities. Doc. 60, Pl.'s Mot. Summ. J., 1. She has been medically diagnosed with, among

other things, cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and profound intellectual disability. *Id.* Marguerite Harrison, Plaintiff's mother, is her next friend and guardian. *Id.* Defendant Cecile Erwin Young is the Executive Commissioner of the Texas Health and Human Services Commission. Doc. 65, Def.'s Mot. Summ. J., 7. She is named as Defendant in her official capacity.

A.    *Medicaid, the Home and Community-Based Services Waiver Program, and the General Revenue Process*

Each state participating in the joint federal- and state-funded Medicaid program must submit a spending plan to the Secretary of the United States Department of Health and Human Services for approval. 42 U.S.C. § 1396. Texas has designated HHSC to administer and supervise its Medicaid plan. Tex. Gov't Code § 531.021(a). Once this plan is approved by the Centers for Medicare & Medicaid Services ("CMS"), which oversees the federal Medicaid program, Congress will provide two dollars to Medicaid for every dollar the state provides. *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 700 (5th Cir. 2007).

In the 1980s, Congress authorized the home and community based waiver program which provides home and community based services ("HCS") for individuals with disabilities that would otherwise require institutionalization. 42 U.S.C. § 1396n(c)(1). This program in essence waives the requirement that these services be provided in an institution. *See id.* The waiver plans attempt to promote "cost-effectiveness and efficiency." *Id.* § 1396n(b). To this effect, to obtain CMS approval for such a plan, HHSC must demonstrate that the average cost per person through the waiver program does not exceed the average cost per person of institutional care. *Id.* § 1396n(c)(2)(D). In Texas, an individual may participate in the waiver program if the cost of care is less than approximately $170,000. *See* 40 Tex. Admin. Code § 9.155(a)(3). HHSC currently

offers a right to a fair hearing to appeal findings that an individual's plan exceeds the cost cap. 1

Tex. Admin Code § 357.3(b)(1).

If an individual's cost of care exceeds the waiver cap, Texas law authorizes HHSC to draw

upon state general revenue funds to fill the gap. *See* 40 Tex. Admin. Code § 40.1. HHSC may draw

on these funds if:

> (1) the individual needs services that exceed the individual cost limit because the
> individual's health and safety cannot be protected by the services provided within
> the individual cost limit;
> (2) the individual receives waiver services at the individual cost limit;
> (3) federal financial participation is not available to pay for services above the
> individual cost limit; and
> (4) there is no other available living arrangement in which the individual's health
> and safety can be protected, as evidenced by:
> > (A) an assessment conducted by . . . clinical staff; and
> > (B) supporting documentation, including the individual's medical and
> > service records.

*Id.* § 40.1(b). Further, "the services funded by general revenue must be: (1) the same service array

offered by the waiver program in which the individual is enrolled; (2) necessary to protect the

individual's health and safety; (3) authorized using the waiver program's criteria; and (4)

unavailable through other funding sources." *Id.* § 40.1(c). Because this funding is discretionary,

HHSC contends that a fair hearing review process is not required upon a denial of general revenue

funds. Doc. 71, Def.'s Resp., 24.

B.    *Harrison's Eligibility for the HCS Waiver Program*

Until April 2018, Harrison qualified for the HCS waiver program and received services

through an HCS Provider, Berry Family Services, without issue. Doc. 60, Pl.'s Mot. Summ. J., 3.

However, according to Harrison's doctors, in 2018, Harrison's health declined. *Id.* Her doctors

determined she would require 24-hour care from a licensed vocational nurse ("24-hour LVN

care")—a significant increase from her previous treatment plan—or risk aspiration and death. *Id.*

Berry Family Services submitted an Individual Plan of Care detailing these findings to HHSC. *Id.* The 24-hour LVN care exceeded the waiver program's cost cap by $45,496.37. *Id.* HHSC conducted a "'utilization review' to determine whether the requested care [was] medically necessary." Doc. 65, Def.'s Mot. Summ. J., 11. During this review process, Harrison requested that general revenue funds be used to cover any care that exceeded the cost cap. Doc. 60, Pl.'s Mot. Summ. J., 3. After a review by HHSC's clinical staff, HHSC concluded that Harrison's condition did not warrant 24-hour LVN care. Doc. 65, Def.'s Mot. Summ. J., 11. Instead, the clinical staff determined that Harrison required 6–12 hours of nursing care per day, but this level of treatment also exceeded the cost cap. *Id.* at 11–12. Because Harrison's care exceeded the cost cap, HHSC notified Harrison that she was no longer eligible for the waiver program and would be terminated from the program. *Id.* at 12. Harrison appealed her termination and requested a fair hearing. *Id.*

While Harrison's hearing decision on her waiver program status was pending, HHSC also evaluated whether she met the criteria for general revenue funding. *Id.* The physician who evaluated Harrison again concluded that 24-hour LVN care was not medically necessary and Harrison "did not qualify for the use of general revenue funds." Doc. 64-1, Glenn Decl., ¶ 11. Further, she determined that Harrison's needs could be met in a state supported living center ("SSLC"). Doc. 60, Pl.'s Mot. Summ. J., 5. After Harrison submitted additional medical documentation to support her proposed treatment plan, HHSC affirmed the decision to deny Harrison's request for general revenue funding. *Id.*

On May 3, 2019, HHSC's hearing officer affirmed HHSC's decision to terminate Harrison from the waiver program. *Id.* The decision was based solely on the determination that Harrison's care exceeded the waiver program's cost cap. *Id.* HHSC terminated Harrison's services that day. *Id.* at 6.

C.     *Procedural Background*

On May 8, 2019, Harrison moved for a temporary restraining order and preliminary injunction to "require HHSC to provide a fair hearing concerning the [general revenue funds] issue and . . . continue to provide Barbara the 24/7, one-on-one licensed nursing care she needs to survive until the fair hearing and related processes were concluded." *Id.* A temporary restraining order hearing was held on May 15, 2019, and the Court ordered that Harrison's 24-hour LVN care be continued until a preliminary-injunction hearing could be held. Doc. 13, TRO. After holding the preliminary-injunction hearing, on June 10, 2019, the Court concluded that Harrison's 24-hour LVN care should be continued, and that it was necessary to order HHSC to conduct additional administrative hearings. *See* Doc. 35, Mem. Op. & Order, 28–29. HHSC appealed this decision, and the Fifth Circuit vacated the preliminary injunction and remanded the case for further proceedings on September 22, 2022. *Harrison v. Young*, 48 F.4th 331, 343 (5th Cir. 2022).

On September 27, 2022, Harrison submitted a new application for services with HHSC. Doc. 65, Def.'s Mot. Summ. J., 13. Harrison requested 24-hour LVN care, along with other services, which totaled $331,000 per year. *Id.* at 14. Upon review of Harrison's application, "HHSC authorized Harrison to re-enroll in the HCS program and receive 79 registered nursing hours per year and 2,029 hours of LVN hours per year which is 5.5 LVN hours per day." *Id.* at 15. The physician reviewing Harrison's application reiterated that, in her opinion, 24-hour LVN care was not medically necessary. *Id.* Harrison has requested a fair hearing to review this determination. Doc. 83, Not., 1. The hearing is scheduled for February 8, 2023. *Id.*

After the case was remanded, the Court requested a status report from the parties as to their desired next steps in this case. *See* Doc. 56, Order. Upon review of the parties' status reports, the Court set a dispositive motion briefing schedule. *See* Doc. 59, Order. After the parties filed

their summary judgment motions, responses, and replies, the United States filed a Statement of Interest in accordance with 28 U.S.C. § 517, and HHSC subsequently filed a response. *See* Doc. 79, Stmt. Int.; Doc. 82, Resp. The Court considers the entirety of the briefing below.

## II.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law . . . identif[ies] which facts are material," and only a "dispute[] over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the facts and the inferences drawn from the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the summary-judgment movant has met its burden, "the non[-]movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). A non-movant may not simply rely on the Court to "sift through the record" to find a fact issue, but must point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The evidence must be such that a jury could reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1075.

III.

ANALYSIS

Harrison seeks two forms of relief from the Court. First, Harrison asks the Court to find that HHSC violated Title II of the Americans with Disabilities Act (the "ADA") or Section 504 of the Rehabilitation Act of 1973 ("Section 504") by failing to provide the care she seeks. *See* 42 § U.S.C. 12132; 29 U.S.C. § 794(a); Doc. 60, Pl.'s Mot. Summ. J, 10. Second, Harrison asks the Court to find that HHSC violated her due process rights by denying her hearing regarding her request for general revenue funding. Doc. 60, Pl.'s Mot. Summ. J, 21–22. HHSC argues that its actions did not discriminate against Harrison and did not violate the Due Process Clause, and claims Harrison has presented no genuine dispute of material fact to show otherwise. Doc. 65, Def.'s Mot. Summ. J., 17–18. The Court first addresses the ADA and Section 504 claims and then the Due Process claims.

A.    *Whether HHSC Discriminated Against Harrison Under the ADA or Section 504*

The Court first addresses Harrison's discrimination claims under the ADA and Section 504. Harrison argues HHSC is required under the ADA to provide 24-hour LVN care in a community setting. *See* Doc. 60, Pl.'s Mot. Summ. J., 9. According to Harrison, HHSC's refusal to fund such care, either through the HCS waiver program or general revenue funding, would require Harrison to enter an institution and result in "unjustified institutional isolation." *See id*. at 10.

HHSC argues that Harrison is not a qualified person under the ADA and thus cannot raise an ADA claim. Doc. 65, Def.'s Mot. Summ. J., 18. HHSC also argues that (1) Congress has issued a new definition for discrimination since the Supreme Court's opinion in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) and (2) even under the definition articulated in *Olmstead*, HHSC did not discriminate against Harrison. *Id*. at 21–22. Under the *Olmstead* definition, HHSC argues that

an SSLC would be a *more* integrated facility for Harrison than her current residence at Berry Family Services and thus her placement there would not be discriminatory. *See id.* at 23. Further, HHSC claims that the accommodation requested by Harrison—that HHSC fund 24-hour LVN care—is (1) not necessary and (2) not a reasonable accommodation. *Id.* at 23–25. In total, HHSC labels this dispute as "simply a disagreement in care, not discrimination." *Id.* at 27.

As a threshold matter, while Harrison alleges both an ADA and Section 504 claim, the Court here will look through the lens of the ADA. "[T]he rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The "only material difference" is the causation requirement—under § 504, the plaintiff's disability must be the sole cause of the discriminatory action, not merely a "motivating factor." *Id.*; *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002). Thus, courts construe and apply these statutes in a consistent manner. *Knowles v. Horn*, 2010 WL 517591, at *3 (N.D. Tex. Feb. 10, 2010) (Kinkeade, J.).

The Supreme Court has held under the ADA that unjustifiably segregating persons with disabilities in institutions rather than community placement constitutes prohibited discrimination.[1]

---

[1] HHSC suggests Congress' 2008 amendments to the ADA altered the definition of discrimination and that definition is now "inconsistent with the *Olmstead* majority's reasoning." Doc. 65, Def.'s Mot. Summ. J., 21. HHSC seemingly attempts to walk back its position in its Response to the United States' Statement of Interest, which flatly rejected HHSC's argument. Doc. 79, Stmt. Int., 7 ("Nothing about the ADAAA alters the analysis of whether discrimination has occurred under Title II, which is the crucial question *Olmstead* decided."); Doc. 82, Resp., 2–3 ("At no point does Defendant claim the ADA amendments abrogated *Olmstead* or the integration mandate."). The Court finds both positions lack merit. The only caselaw cited by HHSC either predates the 2008 amendments *and* the Supreme Court's decision in *Olmstead*, concerns irrelevant factual scenarios, or simply does not support the position HHSC advances. *See, e.g., Alexander v. Choate*, 469 U.S. 287 (1985) (predating the amendments by 23 years); *Traynor v. Turnage*, 485 U.S. 535 (1988) (predating the amendments by 20 years); *Silva v. Baptist S. Fla., Inc.*, 856 F.3d 824, 834 (11th Cir. 2017) (discussing effective-communication claims of deaf individuals against hospitals with insufficient auxiliary aids); *Sanchez v. Johnson*, 416 F.3d 1051, 1067 (9th Cir. 2005) (adhering to

*Olmstead*, 527 U.S. at 588, 600–03 (considering only whether a statutory violation occurred, and not reaching the due-process constitutional issue). In *Olmstead*, the Supreme Court concluded that the ADA encompassed an integration mandate that prohibited unnecessary institutionalization and outlined three elements to be considered in such a claim:

> the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions. . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 587. In other words, an agency is expected to make reasonable modifications to its programs to satisfy this integration mandate. *Id.* at 592.

But this integration mandate is not boundless. *Id.* at 603. An agency may defend its position by showing that the requested modifications would constitute a "fundamental alteration" of the State's services and programs. *Id.* Under the fundamental alteration defense, if a state can "demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings," *id.* at 605–06, and interfering with such plan would "constrain the state's ability to satisfy the needs of other institutionalized patients," *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 157 (3d Cir. 2005), a court should not intervene. Courts should consider this defense in light of "the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services

---

*Olmstead* analysis). Additionally, the Fifth Circuit, in vacating this Court's preliminary injunction, followed the framework articulated in *Olmstead*. *See Harrison*, 48 F.4th at 341–43. Given the lack of support for HHSC's position, the Court sees no reason to depart from the Fifth Circuit's approach.

equitably." *Olmstead*, 527 U.S. at 597. A "simple comparison" between "the cost of caring for [a] plaintiff[] in a community-based setting with the cost of caring for [her] in an institution" may be too simplistic. *Id.* at 604.

First, the Court must address whether it has jurisdiction to hear Harrison's claims. Since the Fifth Circuit's decision to vacate the preliminary injunction, the dispute between Harrison and HHSC has fundamentally changed. At the time of the Fifth Circuit's opinion, Harrison had been terminated from the HCS waiver program entirely. *See* Doc. 1, Compl., ¶¶ 39, 41, 48. Now, after reviewing Harrison's most recent application, HHSC has "authorized Harrison to re-enroll in the HCS waiver program and receive 79 registered nursing hours per year and 2,029 hours of LVN hours per year which is 5.5 LVN hours per day." *See* Doc. 65, Def.'s Mot. Summ. J., 15; Doc. 64-1, Glenn Decl., ¶ 13; Doc. 64-3, Hanks Decl., ¶ 13. The Court finds that this development moots Harrison's ADA claim.

The Supreme Court has repeatedly described mootness as "the doctrine of standing set in a time frame." *See, e.g.*, *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997). Mootness dictates that "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* "Mootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013).

The Fifth Circuit in *Koenning v. Janek* applied the doctrine of mootness to a dispute over Medicaid benefits. 539 F. App'x 353 (5th Cir. 2013). There, Brian Martin, one of three plaintiffs, brought a suit challenging an HHSC policy that categorically excluded custom power wheelchairs with mobile standers "contravene[d] federal Medicaid law and policy." *Koenning v. Suehs*, 897 F.

Supp. 2d 528, 531–32 (S.D. Tex. 2012), *vacated sub nom. Koenning v. Janek*, 539 F. App'x 353 (5th Cir. 2013). The district court found that the policy "conflict[ed] with the reasonable standards requirement of the Medicaid Act," "[was] preempted by the Supremacy Clause," and "violate[d] the due process protections afforded by the Fourteenth Amendment and relevant provisions of the Medicaid Act." *Id.* at 556. HHSC was thus enjoined from enforcing its policy exclusion. *Id.* However, before the issue reached the Fifth Circuit, HHSC, in accordance with the lower court's ruling, considered and "denied Martin's request for a mobile stander" because while mobile standers were no longer categorically excluded, "the papers Martin sent in did not show why a mobile stander was medically needed for him." *Koenning v. Janek*, 539 F. App'x at 354 (internal alternations omitted). As a result, the Fifth Circuit held "Martin's claims, which presume[d] a medical need for a mobile stander, no longer present[ed] a live case or controversy against []HHSC." *Id.* Thus, Martin's claims were dismissed as moot. *Id.* at 355.

Similarly, here, Harrison's claims, which presume her imminent institutionalization, no longer present a case or controversy for the Court to adjudicate. Harrison is re-enrolled in the waiver program, may remain at BFS, and may receive 5.5 LVN hours per day. *See* Doc. 65, Def.'s Mot. Summ. J., 15. HHSC's adjudication of Harrison's most recent application has effectively eliminated the risk of Harrison being unjustifiably segregated. The only dispute that remains between the parties is whether Harrison requires more than the allotted 5.5 LVN hours per day. That dispute, however, does not implicate Harrison's rights under *Olmstead* and the ADA, as Harrison no longer faces institutional isolation. 527 U.S. at 600 (holding such isolation to be a form of discrimination under the ADA). As such, this Court can no longer provide any meaningful relief to Harrison under the ADA. If Harrison wishes to challenge HHSC's decision regarding her care, she may do so "through [Texas's] administrative process, including, if necessary, an appeal to

the state courts."[2] *See Koenning v. Janek*, 539 F. App'x at 354; Tex. Gov't Code § 531.019 (describing the process for administrative review of a decision by HHSC); 1 Tex. Admin. Code § 357.703(c) (describing the process for judicial review of an administrative decision, including HHSC's fair hearing process).

The Court acknowledges the seriousness of Harrison's medical conditions and the need to provide her adequate, comprehensive medical care. However, the ADA's integration mandate is no longer the proper vehicle to challenge HHSC's decisions regarding Harrison's care. Accordingly, as a result of HHSC's decision to re-enroll Harrison in the HCS waiver program, the Court finds that Harrison's ADA claim should be **DISMISSED AS MOOT**. *See Envtl. Conservation Org. v. City of Dallas,* 529 F.3d 519, 525 (5th Cir. 2008) ("If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents."). Thus, the Court **DENIES** both Harrison and HHSC's Motions for Summary Judgment as to Harrison's ADA claims (Docs. 60 & 65).

B.      *Whether HHSC Violated the Due Process Clause by Denying Harrison's Request for a Fair Hearing on HHSC's Denial of General Revenue Funding*

The Court next addresses Harrison's due process claim regarding the lack of fair hearing process for HHSC's denial of general revenue funds. Harrison cites a Northern District of Texas case, *Knowles v. Horn*, 2010 WL 517591, to argue that these general revenue funds "are inextricably intertwined with the underlying Medicaid funds" and thus "[b]y denying [Harrison] access to a Medicaid fair hearing to challenge the denial of [general revenue] funding," HHSC violated Harrison's right to due process. Doc. 60, Pl.'s Mot. Summ. J., 22, 24. In response, HHSC argues

---

[2] In fact, Harrison has utilized Texas's administrative review process. A Medicaid Fair Hearing regarding HHSC's decision on Harrison's care is scheduled for February 8, 2023. *See* Doc. 83, Not., 1.

Harrison is entitled to a fair hearing "only when she is denied Medicaid-funded services," and "general [] revenue funds, by definition, are not [Medicaid-funded services]." Doc. 71, Def.'s Resp., 24.

To establish a due process violation based on the denial of a government benefit, a plaintiff must first demonstrate she possessed a property interest that was infringed. "If there is no protected property interest, there is no process due." *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992). "Property interests are created and defined by 'existing rules or understandings that stem from an independent source such as state law.'" *Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). To have a property interest, a plaintiff must establish "more than abstract need or desire for [a benefit.]" *Roth*, 408 U.S. at 577. Further,

> the mere existence of a governmental program or authority empowered to grant a particular type of benefit to one such as the plaintiff does not give the plaintiff a property right, protected by the due process clause, to receive the benefit, absent some legitimate claim of *entitlement*—arising from statute, regulation, contract, or the like—to the benefit.

*Blackburn v. City of Marshall,* 42 F.3d 925, 941 (5th Cir. 1995).

Harrison has not established a statutorily created property interest to a fair hearing process regarding the denial of general revenue funds.[3] The Medicaid Act requires states to provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical

---

[3] Harrison's briefing attempts to distinguish between a constitutional due process claim, which the Fifth Circuit rejected, and a "statutory due process claim." Doc. 60, Pl.'s Mot. Sum. J., 22. The supposed difference between these claims, however, is unclear. To the extent Harrison raises a basic statutory violation claim—that HHSC failed to follow "the procedural mandates of the Medicaid statute"—the Court finds such a claim fails for the same reasons discussed below. *Id.* That is, the Medicaid statute does not govern the apportionment of general revenue funding. Thus, HHSC did not violate the Medicaid statute by failing to provide a fair hearing on its denial of general revenue funds.

assistance under the plan is denied." 42 U.S.C. § 1396a(a)(3). There is no such right provided for a denial of general revenue funds. *See* 40 Tex. Admin. Code § 40.1; *see also Harrison*, 48 F.4th at 341 (holding Harrison was unlikely to succeed on her due process claim because "it is unlikely that Harrison has a property interest in the [general revenue funding] she is seeking"). Because of this, Harrison attempts to shoehorn the general revenue funding into the Medicaid Act. *See* Doc. 60, Pl.'s Mot. Summ. J., 22. However, this attempt fails.

First, Harrison misconstrues the waiver application to support her claim. Harrison attempts to insert the terms "general revenue" and "general revenue funding" into inapplicable provisions of the HCS waiver application to demonstrate the inextricability of the two sets of funds. *See id.* at 27 & n.13. However, the section of the waiver application cited by Plaintiff discusses the "non-federal share" of funds used to fund the HCS waiver program. Doc. 60-7, Ex. 7, 255. And while these funds are "legislative appropriations of state general revenue," they refer to the "non-federal matching funds" which "are appropriated to the State as a specific line item for the provision of the HCS waiver." *Id.* These federal and state funds are then combined to fund the waiver program and "to make payments to the program provider[s]," for example, in this case, Berry Family Services. *See id.*

The use of additional general revenue funding is referenced in a separate section of the waiver application which discusses "a change in the participant's condition or circumstances post-entrance to the waiver [program] that requires the provision of services . . . that exceeds the cost limit." *See id.* at 30. This section states that "[a]dditional services in excess of the individual cost limit *may* be authorized" and other safeguards to ensure an individual's welfare include the "*possible use* of state funds to cover costs above the cost limit." *Id.* (emphasis added). Nothing in the application suggests that these general revenue funds are so synonymous to the state-appropriated

Medicaid funds to warrant a fair hearing and Harrison's attempt to rewrite the waiver application is unavailing.

Next, courts have categorized general revenue funds as distinct from funds provided under the Medicaid Act. The Fifth Circuit in *Harrison* recognized this separateness when holding that, while Harrison likely possessed a property right for Texas Medicaid benefits, she likely did not possess such a right to general revenue funds. *See* 48 F.4th at 341. Additionally, a court in this district denied a motion for a preliminary injunction on an identical claim by a different plaintiff because the plaintiff possessed "no property right in general [revenue] funds." *Ramirez v. Young*, 2022 WL 16919351, at *2 (N.D. Tex. Nov. 14, 2022) (Pittman, J.), *adopting recommendation of* 2022 WL 17460792 (N.D. Tex. Oct. 04, 2022) (Cureton, Mag. J.).

Finally, Harrison's single cited case, *Knowles v. Horn*, is unpersuasive. 2010 WL 517591. While the court in *Knowles* found that "state general revenue [was] inextricably intertwined with . . . Medicaid funds" and the plaintiff "ha[d] a due process right to a fair hearing," this case directly contradicts the Fifth Circuit's opinion in *Harrison*. *Compare Knowles*, 2010 WL 517591 at *6, *with Harrison*, 48 F.4th at 341 (discussing whether Harrison possessed a "claim of entitlement" to Medicaid benefits and, separately, general revenue funding). Further, this case is unpublished and has only been cited for the proposition at hand in one other opinion, this Court's order issuing the preliminary injunction that was vacated by the Fifth Circuit. *See Harrison ex rel. Harrison v. Phillips*, 395 F. Supp. 3d 800, 813 (N.D. Tex. 2019), *vacated and remanded sub nom. Harrison v. Young*, 48 F.4th 331 (5th Cir. 2022). As a result, this case provides little persuasive value.

The Court concludes there is no dispute of material fact as to whether Harrison was entitled to a fair hearing on the denial of general revenue funding. She is not entitled to such hearing and thus HHSC has not violated her right to due process. For these reasons, Harrison's Motion for

Summary Judgment as to her due process claim is **DENIED** and HHSC's Motion for Summary Judgment as to Harrison's due process claim is **GRANTED**.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Harrison's Motion for Summary Judgment (Doc. 60) and **GRANTS in part and DENIES in part** HHSC's Motion for Summary Judgment (Doc. 65). Harrison's ADA claims are **DISMISSED AS MOOT**.

SO ORDERED.

SIGNED: February 3, 2023.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE